1

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4   UNITED STATES OF AMERICA,        )
                                     )   Case No. 2:14-cr-357-APG-VCF
5                  Plaintiff,        )
                                     )   Las Vegas, Nevada
6            vs.                     )   Thursday, April 28, 2016
                                     )   Courtroom 6C, 9:19 a.m.
7   BRIAN WRIGHT,                    )
                                     )   MOTION HEARING
8                  Defendant.        )
                                     )   C E R T I F I E D   C O P Y

9

10

11              REPORTER'S TRANSCRIPT OF PROCEEDINGS

12

    BEFORE:        THE HONORABLE ANDREW P. GORDON,
13                   UNITED STATES DISTRICT JUDGE

14

15

16

17

18   APPEARANCES:

19   See next page

20   COURT REPORTER:

21           Heather K. Newman, RPR, CRR, CCR #774
             United States District Court
22           333 Las Vegas Boulevard South, Room 1334
             Las Vegas, Nevada  89101
23           (702) 464-5828

24

25   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.

2

1    APPEARANCES:

2    For the Plaintiff:

3            UNITED STATES ATTORNEY'S OFFICE
             BY:  KIMBERLY M. FRAYN
4                 J. GREGORY DAMM
                  CRANE M. POMERANTZ
5            501 Las Vegas Boulevard South, Suite 1100
             Las Vegas, Nevada 89101
6            (702) 388-6336

7    For the Defendant Brian Wright:

8            BRIAN WRIGHT
             PRO SE
9            Nevada Southern Detention Center
             2190 East Mesquite Avenue
10           Pahrump, NV  89060

11           BELLON & MANINGO, LTD.
             BY:  LANCE A. MANINGO
12           732 South Sixth Street, Suite 201
             Las Vegas, NV  89101
13           (702) 452-6299

14   Also present:

15           Josh Mahan
             Special Agent, FBI
16

17

18

19

20

21

22

23

24

25

3

1          LAS VEGAS, NEVADA; THURSDAY, APRIL 28, 2016; 9:19 A.M.

2                              --oOo--

3                    P R O C E E D I N G S

4

5          COURTROOM ADMINISTRATOR:  All rise.

6          THE COURT:  Thank you.  Please be seated.

7          COURTROOM ADMINISTRATOR:  United States vs.

8  Brian Wright, 2:14-cr-357-APG-VCF.  This is the time set for

9  Motion Hearing.

10          Counsel, please note your appearances.

11          MS. FRAYN:  Good morning, Your Honor.

12  Kimberly Frayn, Gregory Damm, and Crane Pomerantz for the

13  United States.  Also seated at counsel table is Special Agent

14  Josh Mahan.

15          THE COURT:  Good morning to all four of you.

16          MR. POMERANTZ:  Good morning, Your Honor.

17          MR. DAMM:  Good morning.

18          MR. MANINGO:  Good morning, Your Honor.

19  Lance Maningo, standby counsel to Mr. Wright.  Mr. Wright's

20  also present.

21          THE COURT:  Good morning to both of you.

22          PRO SE WRIGHT:  Good morning, Your Honor.

23          THE COURT:  Before I get into the Motions in Limine,

24  Mr. Maningo, when, on Tuesday, did you hear from the United

25  States Government about the charges that they were intending to

4

1  proceed on?

2          MR. MANINGO:  Um . . . boy, Your Honor, I don't know

3  that I was fully prepared for that question right this minute.

4          THE COURT:  Okay.

5          MR. MANINGO:  I received things just over the -- over

6  the Internet pursuant to the filings, but I did also receive, I

7  believe, an e-mail chain from both Ms. Frayn and Mr. Damm.  I

8  would respectfully yield to the -- to the Government for their

9  representations on when they were provided.

10          THE COURT:  I have a file stamp showing that the

11  Motion to Dismiss Count Five was filed at 2:20 p.m. on Tuesday.

12  Did you get a call before then as to that -- what was going to

13  happen?  Do you recall?

14          MR. MANINGO:  I had communications with them

15  throughout -- throughout the day by e-mail and --

16          THE COURT:  Okay.

17          MR. MANINGO:  -- I could look, Your Honor --

18          THE COURT:  That's okay.

19          MR. MANINGO:  -- if you'll allow me.  I don't know

20  offhand if I -- if we spoke specifically about that motion or

21  not.

22          THE COURT:  Ms. Frayn --

23          MR. MANINGO:  But my records show the same,

24  Your Honor, that I received the filing at the same time that

25  you just indicated.

1          THE COURT:  Okay.

2          Ms. Frayn, when did you communicate to Mr. Maningo

3     that you were going to go forward dropping Count Five?

4          MS. FRAYN:  Your Honor, the -- there was a perceived

5     inconsistency in the minute orders.  The initial order said

6     that the Government would have two days to make those

7     decisions.  Mr. Schiess is the only one that had the authority

8     to make that decision.  When it became -- when it was brought

9     to my attention, I became aware that there was this

10    inconsistency, I tried to get Mr. Schiess to authorize what I

11    had proposed to him.  He was unavailable until 2:15 and so as

12    soon as he became available to me, I filed it.  So I could not

13    convey to Mr. Maningo as the Court had desired of me because I

14    couldn't -- I couldn't until Mr. Schiess authorized the

15    dismissal.

16         THE COURT:  Understood.  And I saw some e-mails to

17    that effect.

18         MS. FRAYN:  And then, so the initial -- the initial

19    notification then would not have been as Your Honor would have

20    contemplated, which is me talking to Mr. Maningo and then

21    filing something.  It actually was the reverse.

22         THE COURT:  Okay.

23         MS. FRAYN:  The Pacer got filed and then we all kind

24    of confirmed that he had actually seen it and received it

25    and --

2:14-cr-357-APG-VCF - April 28, 2016

6

 1          THE COURT:  Okay.  So, you didn't call him ahead of

 2   time and say, "Here's the problem.  Here's what we've got"?

 3          MS. FRAYN:  No, sir, because that happened in a very

 4   short period of time that we became aware there was a conflict

 5   and we were missing the 1 o'clock deadline and so . . .

 6          THE COURT:  Okay.

 7          MS. FRAYN:  We filed it so that we would stop the

 8   clock and shorten the time and then we followed up with him.

 9          THE COURT:  Appreciate that.  Okay.

10          Mr. Maningo, you were going to say something.

11          MS. FRAYN:  And -- and -- and, Your Honor, I know

12   that we did that sort of before 3:00 because we were over here

13   with you at 3:00.

14          We followed up with --

15          THE COURT:  I lost you.  I'm sorry.

16          MS. FRAYN:  So, we filed the motion at 2:00

17   something, I believe, and --

18          THE COURT:  2:20.

19          MS. FRAYN:  I believe that I followed up -- I don't

20   know, I shouldn't maybe make that representation.  I believe

21   that I followed up with him before I came to the hearing but it

22   might have been after.

23          THE COURT:  Okay.

24          Mr. Maningo.

25          MR. MANINGO:  I believe that's all -- that's all

7

1    correct.  With specific reference to the dismissal of Count

2    Five the first notice of -- I'm looking at my notes now, that I

3    received was the 2 o'clock, somewhere around there, filing.

4            THE COURT:  All right.  Just so I'm clear because I'm

5    trying to piece it together.  There was some e-mail between my

6    chambers and Ms. Frayn seeking to find out what was going on.

7    Ms. Frayn sent an e-mail at 1:48 to my staff as well as

8    Mr. Damm and Ms. Silva and Mr. Pomerantz at 1:48 saying,

9    "Here's the problem.  Mr. Schiess is unavailable until 2:15,

10   he's got to authorize this.  As soon as we get information,

11   I'll let them know.  I will immediately (right now) advise

12   Mr. Maningo of this lapse as well."  That's at 1:48.

13   Apparently that didn't happen.

14           MS. FRAYN:  I'm sorry, I don't remember if I

15   forwarded that e-mail to him or not, as I stand here.

16           THE COURT:  Okay.

17           MS. FRAYN:  I'm sure that was my intention when I

18   wrote that to your chambers.

19           THE COURT:  Okay.  At 2:20 the Motion to Dismiss

20   Count Five is filed.  At 2:29 there's an e-mail from Ms. Frayn

21   to my staff, as well as Mr. Maningo at that point, and Mr. Damm

22   and Mr. Pomerantz explaining that this management -- apparently

23   management at the U.S. Attorney's Office read the part of the

24   order that said the Government had two days -- "two days to

25   streamline the Indictment and dismiss some counts and promptly

8

1    notify defendants of the change" and so did not immediately

2    respond to my -- which, Ms. Frayn's request -- last night for

3    authorization to dismiss or modify the Indictment and she

4    apologizes to Mr. Maningo.

5          Now the order doesn't say you have two days.  The

6    minutes of the proceedings say, "Ms. Frayn requests the Court

7    not dismiss this matter and that the Court allow the Government

8    two days to streamline the Indictment and dismiss some counts

9    and promptly notify defendants of the changes."  That was

10   Ms. Frayn's request.  I denied that.  Mr. Schiess was here,

11   Mr. Pomerantz was here when I denied that and I said we're

12   going to go on Friday.

13         At the bottom of those minutes, on Page 2, and

14   perhaps that's where whoever management is at the U.S.

15   Attorney's Office didn't look, it said, "Ms. Frayn is

16   instructed to advise Mr. Maningo of the charges the Government

17   plans to move forward on by tomorrow at 1 o'clock p.m."  I

18   couldn't have been more clear and I distinctly remember saying

19   it has to be followed up with written confirmation so we don't

20   have this potential telephone idea that she says something to

21   him who says something to him and then all of a sudden what he

22   hears is different than what's originally said.  And so at

23   least there's confirmation, I've got written confirmation that

24   it was done and sent over at 2:20.  But it boggles my mind how

25   anybody could have misinterpreted what was going on.

1           Ms. Frayn, I take from your e-mails you realized that

2   because you say "I will immediately (right now)" and you point

3   out there was some miscommunication or something and that you

4   requested authorization the night before to dismiss and

5   apparently you had to wait for Mr. Schiess to grant that.

6   Okay.  I would have expected somebody to let Mr. Maningo know,

7   "Hey, we're waiting.  We need authorization, but at least

8   here's what we're thinking."

9           The definition of exasperate is irritated or annoyed

10  to the point of injudicious action.  I'm trying not to be

11  injudicious, but I have been exasperated for the last three

12  days and when this occurred on Tuesday, it just made it further

13  problematic.

14          Now, the Government has moved for more time last

15  night.  Did you give a copy of that to Mr. Wright?

16          MR. MANINGO:  I did this morning, Your Honor.

17          THE COURT:  Okay.  So, Mr. Wright, you're aware that

18  last night the Government filed a motion for more time?

19          PRO SE WRIGHT:  Yes, Your Honor.  I just received it

20  this morning.

21          THE COURT:  Okay.  I saw it late last night.

22          Contrary to what the U.S. Attorney's Office may be

23  thinking, this is not about punishing the U.S. Attorney's

24  Office.  This is not about sanctions.  This is not about

25  punishing anybody.  This is about affording Mr. Wright his fair

2:14-cr-357-APG-VCF - April 28, 2016

10

1  opportunity to defend himself.

2         Your motion asks for a favor and you've done nothing

3  to earn that favor.  If anything, you've done the opposite of

4  that.

5         Mr. Maningo, once you found out at 2:20 on the -- on

6  the filing as to what charges were going forward, were you able

7  to convey that to Mr. Wright at what time, do you recall?

8         MR. MANINGO:  Thank you, Your Honor.  Yes.

9         And just to be fair and accurate on the record.  I

10  did --

11         THE COURT:  Please.

12         MR. MANINGO:  -- receive an e-mail from Ms. Frayn at

13  1 -- my -- my records show 1:49.

14         THE COURT:  Okay.  Just -- and what did that e-mail

15  tell you?

16         MR. MANINGO:  It -- it said that they were working to

17  rectify as soon as possible.

18         THE COURT:  Okay.  All right.  So, that helps.

19         MR. MANINGO:  And I think it referenced the

20  authority --

21         THE COURT:  Yeah.

22         MR. MANINGO:  -- that that was needed by Ms. Frayn.

23         THE COURT:  But they didn't tell you at that point

24  what charges were going forward?

25         MR. MANINGO:  I don't believe so.

2:14-cr-357-APG-VCF - April 28, 2016

11

 1          THE COURT:  Okay.  So when you found out at 2:20, how
 2   were you able to communicate to Mr. Wright?
 3          MR. MANINGO:  I was in communications with -- with
 4   all three U.S. attorneys during the afternoon yesterday and I
 5   had had calls with Brian the day before, but I don't think we
 6   knew exactly -- I wasn't able to make contact with him so, the
 7   soonest I can absolutely state to the Court that I talked to
 8   him about the count being dropped would be yesterday afternoon,
 9   unless -- do you recall us talking about that before that?
10          PRO SE WRIGHT:  Yesterday afternoon, Your Honor.
11          MR. MANINGO:  And that's just -- that's just a matter
12   of, Your Honor, I wasn't able to drive to Pahrump and back and
13   so we were working through what we can to fax "Emergency call
14   needed.  Please have Mr. Wright call my office."  And sometimes
15   that happens and sometimes we're not able to get communication
16   as soon as we'd like.
17          THE COURT:  Do you believe if you had got the
18   information at 1 o'clock, as opposed to 2:20, that situation
19   would have changed at all?
20          MR. MANINGO:  I don't know.  I mean, in terms of
21   my --
22          THE COURT:  Ability to contact Mr. Wright.
23          MR. MANINGO:  I can't say -- say it, Your Honor.  I
24   think we were trying to communicate with him on all issues.
25   Whether it be the Motions in Limine, all of that at the same

12

1    time and it was just -- communications is sometimes tough.

2            THE COURT:  I can appreciate that.

3            MR. MANINGO:  So I can't really say.

4            THE COURT:  I appreciate that.  Thank you,

5    Mr. Maningo.

6            Well, the Government cost Mr. Wright at least another

7    hour and a half beyond the 1 o'clock deadline that I imposed.

8    It appears to me that could have been avoidable if Ms. Frayn

9    had been authorized to make the decision and that the only

10   reason that decision was delayed was because Mr. Schiess had to

11   make that authorization and he wasn't available until 2:15.

12   Despite everything that happened the day before, I would have

13   expected the U.S. Attorney's Office to not violate another of

14   my orders and to have some mechanisms in place so that you

15   could comply, if not overcomply.

16           So because you cost Mr. Wright another hour and a

17   half I'm going to take that off the Government's time and not

18   Mr. Wright's.  And so we're going to end on Friday at 3:30

19   instead of 5 o'clock.  Because that's not fair to Mr. Wright

20   that you get that extra time to prepare.

21           I'm not even yet going to get into the fact that

22   there was another witness list filed yesterday adding a

23   witness.  We will get into the issue in a few minutes about the

24   fact that another exhibit list that was filed yesterday added

25   exhibits to the day before, and added an exhibit that was never

2:14-cr-357-APG-VCF - April 28, 2016

13

1    even on the original exhibit list.

2            I had to look up how to spell exasperated this

3    morning.

4            MR. MANINGO:  Your Honor . . .

5            THE COURT:  Yes, Mr. Maningo.

6            MR. MANINGO:  I'm sorry.  I don't mean to interrupt.

7    May I make a record?

8            THE COURT:  Yes.  Please.  Go ahead.

9            MR. MANINGO:  But Mr. Wright, I know I'm just standby

10   counsel, he's asked me to make a record on his behalf --

11           THE COURT:  Okay.  Please.

12           MR. MANINGO:  -- if I could.

13           I think you touched on some of the points that

14   Mr. Wright has asked me to note, which is the exhibit list last

15   night, the witness list adding Ms. Perreira as a witness.

16   Also, and I haven't had the opportunity to review it but I just

17   provided it to my client but I believe there was additional

18   discovery provided on the 26th.

19           THE COURT:  Monday -- Tuesday.

20           MR. MANINGO:  On Tuesday.

21           THE COURT:  Fabulous.

22           MR. MANINGO:  And Mr. Wright appreciates where the

23   Court's -- where the Court's going on this but has asked me to

24   renew the Motion to Dismiss and just to emphasize how he's not

25   seeking punishment to the Government necessarily but, thinks

14

1    he's incredibly handicapped in his ability to defend himself in

2    this case and has wanted me to, like I said, Your Honor, renew

3    his Motion to Dismiss as he sees that as the only remedy that

4    could possibly cure this.

5              THE COURT:  I appreciate that.

6              MR. MANINGO:  Thank you.

7              THE COURT:  I will give that some consideration

8    actually.

9              MS. FRAYN:  Your Honor, if I may speak to the

10   discovery issue.

11             THE COURT:  Please.

12             MS. FRAYN:  I had advised the Court and the defendant

13   on the record my intent to push those transcripts out for his

14   convenience, noting that they had probably already been in the

15   public record for the Suppression Hearing.

16             THE COURT:  And that's what I was going to ask.  What

17   exactly is the new discovery?

18             MS. FRAYN:  The bulk of what was pushed out was just

19   that.

20             THE COURT:  And just so I've got a clear record.

21   You're talking about the transcripts from the discovery hearing

22   on the Motion to Suppress?

23             MS. FRAYN:  I'm talking -- yes.  I am talking about

24   Detective Condratovich and Luszczyk -- I may have said that

25   completely wrong -- who testified before Magistrate Judge

1    Ferenbach in conjunction with Ms. Perreira's suppression.

2            THE COURT:  Okay.

3            MS. FRAYN:  I had noted before for the Court that it

4    was probably in the public record because we litigated so much

5    and the transcripts were prepared.

6            THE COURT:  Um-hmm.

7            MS. FRAYN:  But that I was pushing them out because

8    we anticipated Detective Condratovich testifying at that point.

9            THE COURT:  And so that was what was the new stuff

10   that was produced?

11           MS. FRAYN:  That was the bulk of it.

12           THE COURT:  Okay.

13           MS. FRAYN:  The night before that discovery was

14   produced, Detective Aguiar sent me an e-mail and said, "These

15   items" -- 18 pages -- "had been separated from my main case

16   file and I just came across them.  I apologize.  Here they

17   are."  They were 18 pages, consisting of some Sin City records

18   and some telephone log for April of 2014 and then for -- one or

19   two pages of an undated for Mr. Cole's phone.  So that's the --

20   that's the -- that's the new information that was provided to

21   me the night before and I provided it the next morning.  But

22   the bulk of what it was were the pages of those transcripts,

23   sir.

24           THE COURT:  And so you got that from Detective Aguiar

25   on Monday night and then you produced it on Tuesday morning?

16

1          MS. FRAYN:  Yes, sir.

2          THE COURT:  I appreciate you turning that around so

3     quickly.

4          Is any of that new material exculpatory of

5     Mr. Wright?

6          MS. FRAYN:  Not that I am aware of, sir.  I don't

7     know how -- I don't know his theory of defense so I don't know

8     how Cole's phone logs play into that theory but, not -- not

9     from the Government's perspective.

10          THE COURT:  Okay.  And the intent -- I presume the

11     Government doesn't intend to use that information at trial.

12          MS. FRAYN:  No, sir.

13          THE COURT:  Okay.

14          MS. FRAYN:  Just fulfilling our ongoing obligation.

15          THE COURT:  I appreciate that.

16          And believe me, I don't fault the U.S. Attorney's

17     Office for that at this stage because apparently you got that

18     late from the Metro or Henderson PD detective.

19          Well, Mr. Wright has moved to dismiss based upon this

20     additional violation of my order and putting him in a worse

21     spot.  You want to respond to that, please.

22          (Brief pause in proceedings.)

23          MR. POMERANTZ:  Your Honor, may I respond to that?

24          THE COURT:  Yeah.  Sure.

25          MR. POMERANTZ:  And, Your Honor, as the Court knows,

1    I filed a notice of appearance.

2              THE COURT:  Yes.

3              MR. POMERANTZ:  I don't take that for granted.  I'm

4    seeking the Court's permission to --

5              THE COURT:  No, it's granted.  No worries.

6              MR. POMERANTZ:  -- to appear.  Thank you, Your Honor.

7              Your Honor, as the Court knows, dismissal of an

8    Indictment is a significantly severe action in this case.  The

9    United States is not proud of what's gone on in this case.  The

10   Court's critique, the Court's exasperation, the Court's

11   frustration is in my opinion completely and utterly justified.

12   There are things we need to do better and there are things we

13   do -- we will do better.  What we're talking about though,

14   Your Honor, is the Court, in an effort to vindicate

15   Mr. Wright's rights, imposed upon the Government the

16   responsibility of presenting its case in a day -- now, by

17   3:30 -- and we take the Court to heart and we will do what the

18   Court says.

19             I -- I think what we're talking about, however, is

20   what additional prejudice befell Mr. Wright as a result of that

21   hour and a half.  And the United States sincerely appreciates

22   Mr. Maningo's candor and he has been a gentleman -- I just want

23   to put on the record what a gentleman he's been.  Hasn't been a

24   pushover.  He's been fighting for his client hard, but in a

25   courteous, professional way.  What Mr. Maningo says is as a

2:14-cr-357-APG-VCF - April 28, 2016

18

1    result of difficulties in getting in touch with an incarcerated

2    defendant, that he can't say to the Court that he would have

3    gotten this information to Mr. Wright, that Mr. Wright would

4    have acted upon this information any faster.  So what I would

5    submit to the Court is while your exasperation is completely

6    founded, completely justified, what we don't have is any

7    additional prejudice to the defendant as a result of this hour

8    and 20 minutes, given the difference between 1:00 and 2:20 when

9    the notification should -- should have come.

10           So, on that ground, Your Honor, not excusing what

11   happened, not condoning what happened, the United States

12   Attorney's Office has to earn back your trust and we will do

13   that but, I would submit to the Court that under these

14   circumstances, there hasn't been the type of prejudice to the

15   defendant as a result of this hour and a half lapse, or hour

16   and 20 minute lapse.

17           THE COURT:  Mr. Wright, you want to respond to that?

18           MR. MANINGO:  The Court's indulgence, Your Honor.

19           THE COURT:  Sure.

20           (Discussion at defense table.)

21           MR. MANINGO:  Your Honor, in speaking to Mr. -- and I

22   appreciate the representations from the Government.  In

23   speaking to Mr. Wright, he advises me that where he is housed

24   in -- in Pahrump, the law library closes at 3:00 . . .

25           PRO SE WRIGHT:  30.

2:14-cr-357-APG-VCF - April 28, 2016

19

```
1          MR. MANINGO:  3:30.  If a notice would have been --
2   whether it be in the morning -- I know the deadline was
3   1 o'clock, but -- and Mr. Wright and I recall the Court saying
4   earlier, if possible, or something to that effect, but the
5   deadline was the deadline.  Had it been earlier, he would have
6   had the opportunity to research and prepare in the law library
7   that night.  So with respect to detriment to my client, he
8   feels that had everything been done timely, he would have had
9   access to a law library for an entire day that he lost.
10          MR. POMERANTZ:  Your Honor, if I may.
11          As to that point, again, I -- I don't question
12  Mr. Maningo's representation, Mr. Wright's representation for a
13  minute.  I don't think we're talking about access to the law
14  library though --
15          THE COURT:  No, I -- I -- I --
16          MR. POMERANTZ:  -- we're talking about the
17  notification to Mr. Wright in getting that information.  Even
18  if it all happened promptly, the law library closes at 3:00 or
19  3:30 and more to the point, I would suggest -- and I'm not
20  being flip with the Court or the defendant -- we were talking
21  about dismissal of a count.  I'm not sure what there was to
22  research.  We were talking about getting rid of Count Five.
23          THE COURT:  No, I appreciate that and . . . I was
24  concerned about this when I set this plan in place Monday
25  evening -- afternoon, that 3:00 -- that the 1 o'clock deadline
```

1    was going to be close because I know it's difficult getting

2    messages out to Pahrump and getting phones set up and whatever

3    else needs to be done out there, but I felt like that was about

4    the earliest that was reasonable for the Government to be able

5    to make a decision, figure out what witnesses and exhibits it

6    were going to use, and then give him the information so that he

7    could prepare and . . . fully fearing that we were going to

8    have some communications problems.

9         It is what it is and, again, my attempt is to uphold

10   Mr. Wright's rights as much I can, but dismissal is an extreme

11   sanction.  No doubt about it.  And I, at this stage, don't feel

12   like it's gotten to the level to grant dismissal.  But my ears

13   are open and my eyes will be open and if . . . if there is

14   further prejudice to Mr. Wright's ability to defend himself,

15   dismissal becomes all that much more possible, if not likely.

16   But at this stage I'm not going to dismiss.  I'm going to say

17   that the Government will finish at 3:30 on Friday.  They've

18   cost Mr. Wright at least an hour and a half beyond my order and

19   he shouldn't suffer for that.  So we will start at 9:00.  The

20   Government will finish by 3:30.  I'm sensitive to the issue

21   raised in the motion for more time and I was going to address

22   that with the parties today anyhow.

23        Mr. Wright, not to suggest you're going to do this

24   but I want to make sure you understand.  If -- if you do what

25   the Government is fearful of, that you attempt to stall or go

1    into the four corners defense, whatever you -- you know, take a

2    two hour opening and drag the cross-exams out, I will give the

3    Government more time.  But I'm going to give you the

4    opportunity to conduct a reasonable opening statement and

5    conduct a reasonable cross-examination of whatever witnesses

6    they put on, as what I would expect of a lawyer if you were a

7    lawyer as opposed to representing yourself.  If you were a

8    lawyer, or if Mr. Maningo were representing you and he tried to

9    stall it out, I would call him on the carpet for that and I

10   would add time to the Government's time.  I don't want to have

11   to get into the point where I have a chess clock going back and

12   forth but I may if it gets to that point.  But I will certainly

13   be sympathetic to a Government request for additional time if

14   the defense unnecessarily drags out the time period that we're

15   operating under.  I am sensitive to that and I will watch that.

16   I'm not suggesting you're going to, I just want to make sure

17   that the word is clear.  And we'll talk a little bit about

18   timing in a few minutes.

19          Let's move next to the Motions in Limine.  And I

20   guess right now the only Motion in Limine still pending is the

21   404(b) motion.

22          Has the Government reduced in any way what -- now

23   that there's a shortened time frame, what it intends to offer

24   into evidence or what it intends to try to offer into evidence

25   that would maybe affect this motion?  Do you still intend to

22

1  try and get all this testimony in I guess is the question.

2          Mr. Damm.

3          MR. DAMM:  Yes.  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. DAMM:  Gregg Damm on behalf of the United States.

6          The motion was brought to this Court's attention to

7  advise the Court prior to trial and prior to the testimony of

8  Mr. Cole of various statements that we anticipate he may make

9  regarding his interaction with Mr. Wright.  I don't believe

10 that the items that we've identified in the motion are covered

11 by 404(b).  I believe that they are facts that encompass the

12 res gestae of the criminal activity and are inextricably

13 intertwined.

14         THE COURT:  Despite the fact that the title says

15 "Motion in Limine to Allow Certain Testimony Pursuant to

16 Federal Rule of Evidence 404(b)."

17         MR. DAMM:  Your Honor, if you read the body of the

18 motion --

19         THE COURT:  I have.  And it seems to focus on

20 inextricable or intrinsic evidence which is inextricably

21 intertwined.  There is mention of 404(b).  So you're not moving

22 under 404(b).  I think that's wise because it's late and

23 there's no notice.  So let's talk about inextricably

24 intertwined.  Is there any of these seven -- actually I guess

25 there's eight because there's two Number 2s -- are there any of

1   these eight categories that you no longer need so that I don't

2   have to rule on them?

3           MR. DAMM:  Your Honor, it's not so much that we need

4   them.

5           THE COURT:  Intend to offer them into trial.

6           MR. DAMM:  But -- and I don't necessarily intend to

7   offer them.  My concern is that in questioning Mr. Cole, I

8   don't exactly know which of these items he may respond to --

9   I -- well, let me put it this way.  I don't expect generally to

10  ask him about all of these categories.  I -- I'm interested

11  in -- in the robberies.

12          THE COURT:  Let me summarize.  You haven't prepped

13  him until the last minute.  You're not exactly sure what he's

14  going to say on the stand.  You're concerned that these areas

15  might come up.  You're previewing them for me, which I

16  appreciate.  So, if you'd have done this timely, it would have

17  been filed at least 30 days ago.  We could have had an

18  out-of-court hearing outside the presence of the jury to

19  determine and figure out exactly what is or is not coming into

20  evidence.  We're passed that.  We can't do it.  Fine.  Okay.

21  It's potentially intrinsic evidence.  If that's the case,

22  404(b) doesn't apply.  I agree with you.  So the question

23  becomes, now we're looking to see -- we need to warn Mr. Cole

24  not to go into these areas.  Am I right?

25          MR. DAMM:  Right.

24

1          THE COURT:  Okay.  Perfect.  I get it now.

2          (Brief pause in proceedings.)

3          Okay.  So the issue is we need to make sure he

4    doesn't touch on some of these issues; what are the issues

5    we're going to exclude.

6          MR. DAMM:  Well, no.

7          THE COURT:  Okay.

8          MR. DAMM:  I don't think that's really the issue.  I

9    think the -- from my standpoint, this is all fair game.

10          THE COURT:  I understand.  I don't.  I disagree, but

11   that's what we're going to try and narrow down now.

12          MR. DAMM:  Okay.

13          THE COURT:  All right.  So -- so, bottom line, the

14   answer to my question is, everything in this is still what the

15   Government wants to move on; you haven't withdrawn some of this

16   because you now have shortened time?

17          MR. DAMM:  No, I -- I'm not suggesting that we're

18   necessarily going to get into all of these areas.

19          THE COURT:  Okay.

20          MR. DAMM:  But, if I ask Mr. Cole a question about

21   . . . something he may have done before one of the robberies

22   and he says, "Well, we were -- we were out smoking dope

23   together," then . . .

24          THE COURT:  Okay.  Let me ask you.  Is smoking dope

25   intrinsic evidence?  Is it inextricably intertwined with these

2:14-cr-357-APG-VCF - April 28, 2016

25

1  charges?

2      MR. DAMM:  Absolutely.

3      THE COURT:  So, I ruled, you realize, back in

4  October, that the text messages about smoking marijuana

5  couldn't come in because, in fact, the Government admitted at

6  that hearing they weren't going to offer that into evidence.

7  Has that position now changed?

8      MR. DAMM:  With respect to Mr. Cole and his testimony

9  and the reason, in part, that he committed these acts was due

10 to the fact that -- that he and Mr. Wright, at Mr. Wright's

11 encouragement, was using drugs.  Not only marijuana but, but

12 others as well.  So, to --

13     THE COURT:  How is -- okay.  Okay.  Fair question.

14 So fair response to me.  How is the smoking of marijuana

15 intrinsically intertwined with the charges in the case?

16     MR. DAMM:  Is it?

17     THE COURT:  That's what I'm asking you.  How do you

18 think it's inextricably intertwined?

19     MR. DAMM:  Because it's one of the methods that

20 Mr. Wright used to lower inhibitions of Mr. Cole to induce him

21 to commit an act that he otherwise wouldn't have been inclined

22 to commit.

23     THE COURT:  Despite the fact that Mr. Cole met

24 Mr. Wright because he claims he sold Mr. Wright marijuana?

25     MR. DAMM:  Your Honor, I'm not suggesting that

2:14-cr-357-APG-VCF - April 28, 2016

26

1    because Mr. Cole was selling marijuana that -- that that

2    somehow disengages Mr. Cole from the influence of Mr. Wright.

3            THE COURT:  Agreed.  I'm just trying to see how it

4    makes logical sense.

5            MR. DAMM:  No, I understand.

6            THE COURT:  I don't see how it's inextricably

7    intertwined.  But even if it is, I think it stays out under

8    403.  I just think it's highly prejudicial.  I don't see much,

9    if any, probative value and I think the prejudicial effect

10   substantially outweighs whatever probative value there is to

11   it.  Again, the Government said last time, in October, that

12   they weren't going to offer the text messages that referred to

13   doing drugs.  I don't know how his testimony is any different

14   than the text messages.  The prejudicial effect is still the

15   same.  I can understand you're arguing that there is some more

16   probative value now because it shows that Mr. Cole was -- his

17   inhibitions were lowered by the fact that they were doing drugs

18   together, but I just don't see how it's inextricably

19   intertwined with this crime.

20           Keep in mind that intrinsic evidence or inextricably

21   intertwined arises when this other evidence requires it to be

22   admitted for a coherent and comprehensible story of the charged

23   crime and that that story can't be told without mentioning

24   these other offenses.  Or, that this other evidence serves as

25   the basis for the criminal charge, or a part of the transaction

1    that serves as the basis.  I don't see the smoking marijuana

2    coming in under either of those circumstances.

3              So, the issue of smoking marijuana will not be

4    raised.  You will instruct Mr. Cole not to raise that issue.

5              MR. DAMM:  Your Honor, there's more than just the

6    marijuana.  There were other drugs and I presume that your

7    order would involve any and all drugs, including specifically

8    the marijuana?

9              THE COURT:  Has the defendant ever been told that

10   there would be evidence of other drugs?

11             MR. DAMM:  Yes.

12             THE COURT:  The first time I've heard about Ecstasy

13   was when Ms. Frayn raised it at the hearing on Monday

14   afternoon, or when we discussed it on Monday.

15             MR. DAMM:  Your Honor, in an FBI 302 Report of

16   Interview, which apparently occurred on August 4th of 2015, and

17   I believe was turned over to the defendant shortly after that,

18   it indicates -- and I have a copy for the Court -- it indicates

19   on the first page, "In addition, Cole smoked marijuana every

20   day and also intermittently used Ecstasy, Xanax, and codeine."

21             THE COURT:  Cole did.  He used those.

22             MR. DAMM:  Yes.

23             THE COURT:  How is that connected to Mr. Wright?

24             MR. DAMM:  Because Mr. Wright encouraged and provided

25   these various drugs to Mr. Cole.  They used them together prior

1    to the commission of these robberies.

2            THE COURT:  Does it say that in the 302?

3            What you just read to me says the 302 says Mr. Cole

4    used drugs.

5            MR. DAMM:  That is correct.

6            THE COURT:  I haven't heard any connection to

7    Mr. Wright.  I've never seen that 302.  It wasn't attached to

8    the motion.  So I have no idea what you're talking about other

9    than what you're telling me and what you're telling me is

10   there's no connection to Wright.

11           MR. DAMM:  Well, Your Honor, I'd have to review

12   the -- the rest of the 302 myself, and I have a copy for the

13   Court.

14           THE COURT:  This would have been nice to have been

15   done 30 days before trial instead of at the last minute.  It's

16   denied.  You can't bring in the evidence of the drugs, under

17   403.

18           Next is, looking at Page 5 of your motion, talking

19   about many of the discussions leading up to the planning and

20   execution of the robberies were made by Wright, Jackson, and

21   Cole riding around in a car smoking marijuana.

22           You can talk about riding around in a car.  You can

23   talk about hanging out together, but you're not going to talk

24   about marijuana or other drugs.

25           Next it says, "Cole will testify that Wright and he

1    were smoking marijuana outside of Perreira's apartment.

2    Jackson went in, got a firearm, which he gave to Wright.  Cole

3    testified that's the weapon he used and brandished in the first

4    robbery."

5              Did the weapon get from Wright to Cole?

6              MR. DAMM:  Did the weapon get from Wright to Cole?

7              THE COURT:  I have the weapon in Perreira's

8    apartment.  Jackson takes it and gives it to Wright.  Is there

9    going to be any testimony that the weapon went from Wright to

10   Cole?

11             MR. DAMM:  Absolutely.

12             THE COURT:  When?

13             MR. DAMM:  Some time before the first robbery.

14             THE COURT:  Okay.  Who's going to testify to that?

15             MR. DAMM:  Mr. Cole.

16             THE COURT:  That may be relevant.  That may be

17   inextricably intertwined.

18             MR. DAMM:  In fact, the testimony will be that

19   Mr. Wright provided each and every weapon for all of the

20   robberies.

21             THE COURT:  Okay.

22             Mr. Wright.

23             MR. DAMM:  He gave them directly to Mr. Cole and then

24   Mr. Cole gave them back to Mr. Wright.

25             THE COURT:  Except for the one that he put in the

2:14-cr-357-APG-VCF - April 28, 2016

30

1  backpack and threw in Ms. Perreira's car.

2            MR. DAMM:  Well, that was the method of getting --

3            THE COURT:  So at some point he got it back out of

4  the car and gave it to Wright?

5            MR. DAMM:  Correct.

6            THE COURT:  Okay.  All right.

7            Mr. Wright, let me hear your argument on this one.

8  Why shouldn't this one come in?

9            PRO SE WRIGHT:  Um, the Court's indulgence,

10 Your Honor.

11           THE COURT:  Certainly.

12           (Discussion at defense table.)

13           PRO SE WRIGHT:  Your Honor, I don't see the

14 relevance, but right now, I just want to put on record that

15 none of these statements were said in furtherance of a

16 conspiracy.  They actually were made a year later.  Now, the

17 FBI report and the reports that Mr. Damm -- the Government is

18 representing was made, was not made in furtherance of a

19 conspiracy.  I just wanted to put that on record.

20           THE COURT:  And -- and -- and I saw that in your --

21 in the papers that you filed and just so I'm clear for the

22 record.  They are sort of two competing issues here.  One is,

23 what you're referring to is statements made in furtherance of

24 the conspiracy by a co-conspirator.  That's a hearsay exception

25 that would apply if someone were to get on the stand and say

1    Mr. Cole said this.  But when Mr. Cole gets on the stand to

2    testify, it's no longer hearsay because he's in court

3    testifying on the record this is what I did, this is what I

4    said.  It's no longer an out-of-court statement; it's an

5    in-court statement that you can can cross-examine him on.  So,

6    that takes it out of the co-conspirator hearsay exception.  The

7    issue that I'm dealing with more is in terms of whether this is

8    excluded under Rule of Evidence 404(b).  The Government says

9    it's inextricably intertwined, or intrinsic evidence, meaning

10   404(b) doesn't apply; we can bring this in as evidence as part

11   of the crime.

12            So, I get your argument, I understand it but, you're

13   sort of going on an issue that I've moved past.  Okay?

14            PRO SE WRIGHT:  All right.

15            THE COURT:  All right.  So I'm going to -- I'm going

16   to at this stage, subject to obviously tying it in and getting

17   the evidence, I'm not going to prohibit Mr. Cole from

18   testifying about this gun getting from Mr. Wright to Mr. Cole,

19   as long as there's credible testimony and barring any other

20   kind of objection, I'm not going to outright prohibit them at

21   this stage on that one.

22            The next item in your Motion in Limine is the -- it's

23   the second Number 2, Paragraph 2 and this says that Wright was

24   the mastermind who guided the conspirators because he had

25   knowledge about planning robberies, because Cole knew that

32

1   Wright had committed a similar crime previously, spent time in

2   jail for that crime.  So the question I have is -- and I

3   mentioned this the other day and I don't recall the answer --

4   how did Cole come by this knowledge?  If this is a statement

5   from Wright to Cole, then it's an admission by a party opponent

6   and it seems like it would come in, but if he learned it some

7   other way I've got a hearsay issue.  So, explain that one for

8   me.

9          MR. DAMM:  I would expect Mr. Cole to indicate that

10  it was Mr. Wright that provided that information --

11         THE COURT:  Okay.

12         MR. DAMM:  -- information to him.

13         THE COURT:  Okay.

14         Mr. Wright, anything on that?

15         PRO SE WRIGHT:  I mean, it's at the point now,

16  Your Honor, where they -- where the Government is basically

17  saying Cole could just say anything and say I said anything.

18  I've never told that man that.  As far as I -- I realize -- I

19  mean, I remember, it was told to Cole that I -- that I -- that

20  I committed crimes in the past and been in prison.

21         THE COURT:  And that's -- that's what we're going to

22  have to find out.  It will be up to the jury to judge his

23  credibility.  But if he's going to get on the stand and testify

24  that Mr. Wright told me X, Y, and Z, that's a statement by a

25  party opponent so it's not hearsay.  It seems to me that it has

33

1    probative value.  There is prejudicial effect to it, but it's

2    not substantially outweighed -- the probative value is not

3    substantially outweighed by the prejudicial effect so it's not

4    barred by 403.  It sounds like it won't be hearsay.  So,

5    subject to him being able to say this isn't hearsay and explain

6    why, I'm not going to prohibit him from saying that at this

7    point.

8              PRO SE WRIGHT:  Your Honor --

9              THE COURT:  Yes.

10             PRO SE WRIGHT:  -- can I say one more thing?

11             THE COURT:  Sure.

12             PRO SE WRIGHT:  Doesn't it come into play where you

13   bringing up prior bad acts though?

14             THE COURT:  Well . . . that's a 404(b) issue but,

15   again, if it's inextricably intertwined as part of the

16   conspiracy, if it's inextricably intertwined with all of this,

17   then it's -- 404(b) doesn't apply.  And the Government's

18   position is that this whole conspiracy occurred.  Cole got into

19   it because you allegedly said, "Hey, I've done this before,

20   this is how it works, join my conspiracy, let's start a

21   conspiracy," whatever -- I'm sort of guessing here as what the

22   Government's going to say -- and so this was the genesis, the

23   start of the conspiracy.

24             Mr. Damm, is that -- am I accurately summarizing it?

25             MR. DAMM:  Yes.

1          THE COURT:  Okay.  So that's the -- it's, in my mind,

2     intertwined with the conspiracy charge so it would come in

3     under -- as ex -- as intrinsic evidence.  So 404(b) wouldn't

4     apply.  Provided the proper foundation and ground work is laid,

5     that would come in.

6          All right.  The next one is the attempted robbery of

7     Walgreens.  This is Number 3 on Page 5 of Docket 270 where

8     "defendant Wright first tried to get Cole to rob a Walgreens

9     but Cole was too scared to go through with it."  I have no

10    context for that so Mr. Damm, help me out here.

11         When did it happen?  Where did it happen?  How is it

12    related?  How is it inextricably intertwined?

13         (Discussion at Government table.)

14         MR. DAMM:  Your Honor, the -- the defendant,

15    Mr. Wright, met Mr. Cole in February of 2014.  The first

16    jewelry store robbery occurred in April.  So it was some time

17    after February and before that April date that the suggestion

18    for the -- the initial robbery at Walgreens occurred,

19    Your Honor.

20         THE COURT:  We just don't know when.

21         MR. DAMM:  I don't have a precise date.

22         THE COURT:  Nobody's asked Mr. Cole that yet?

23         MR. DAMM:  I -- I did not and I don't -- I don't have

24    the precise date.

25         THE COURT:  Hate to beat a dead horse, but when you

1    prepare late, this is what happens.

2            So, normally what I would do in a situation like this

3    is, I would say, before this can be presented to the jury, I

4    would need to have a hearing outside the presence of the jury

5    to determine whether this is or is not part of the conspiracy,

6    whether it's inextricably intertwined.  Because I can't --

7    based on what I have in front of me, I can't say it is.  So

8    before you put this in front of the jury, I would have an

9    Evidentiary Hearing outside the presence of the jury.  Because

10   this is late, we can do this on Friday, but it's coming off of

11   the Government's time.  Tick.  Tick.  Tick.  So it's your

12   choice.  If you want to go into this, we'll have an Evidentiary

13   Hearing, but it's counting against the Government's time.  So

14   I'll leave you to decide whether you want to do that or not.

15   Because this should have been addressed well before today and

16   it would have been and it wouldn't cut into anybody's time for

17   trial presentation.  And it's going to be the same, I think,

18   with regard to the Lee's liquor store robbery because I don't

19   have any time frame or anything else on that.  Unless you've

20   got more.

21           MR. DAMM:  The Lee's liquor store robbery occurred on

22   . . . April 20 . . . I believe that was April 26th of 2014,

23   Your Honor.

24           THE COURT:  Okay.

25           MR. DAMM:  So well within the acceptable time frame I

36

1    would suggest to the Court.

2              THE COURT:  Within the on or about range, at least.

3              MR. DAMM:  Yes.

4              THE COURT:  All right.  Tell me about that one.

5              MR. DAMM:  Your Honor, this was another robbery that

6    was initiated by Mr. Wright using Mr. Cole as a proxy.  And the

7    report was turned over previously in discovery to Mr. Wright,

8    Your Honor.

9              MR. MANINGO:  And, Your Honor, Mr. Wright has asked

10   that I respond.

11             THE COURT:  Yeah.  Hang on a second.  Yeah.  I'll

12   give you the opportunity.

13             MR. MANINGO:  Thank you.

14             THE COURT:  Just give me a second.  I want to refresh

15   my memory as to what was in the motion.

16             (Brief pause in proceedings.)

17             And you're saying this was 4-26 of '14?

18             MR. DAMM:  Yes, Your Honor.

19             THE COURT:  So, Count One of the Superseding

20   Indictment says, "Beginning on a date unknown but not later

21   than April 28th."  So this would have been two days before

22   that.

23             MR. DAMM:  Correct, Your Honor.

24             THE COURT:  Okay.  Mr. Wright?  Mr. Maningo?

25             MR. MANINGO:  Thank you, Your Honor.

37

1              And --

2              THE COURT:  And just so we're clear.  Mr. Maningo is

3     standby counsel.  And one function of standby counsel is to

4     assist the Court in the efficient operation of this process.

5     He's not arguing for you.  He can be your mouthpiece on certain

6     issues, Mr. Wright, but this is your case to litigate.  You've

7     chosen to do that.  If you at some point elect to turn it over

8     to Mr. Maningo to run the case, that's your opportunity -- you

9     have that opportunity to do so as well, but . . . I am allowing

10    Mr. Maningo to speak at times because it's more efficient for

11    me to hear from him but, this is your case.  And I want it

12    clear.

13             PRO SE WRIGHT:  I understand, Your Honor.

14             THE COURT:  Okay.  All right.  So as long as you're

15    feeding him what you want him to say to me and he can say it

16    more coherently and easier and efficiently for you, I'm okay

17    with that, within reason.

18             PRO SE WRIGHT:  That's what I'm doing.

19             THE COURT:  In front of the jury it's going to be a

20    different issue though.  Because you're entitled to make sure

21    the jury knows that you are representing yourself and

22    Mr. Maningo has to take a much greater back seat in front of

23    the jury.  Okay?

24             PRO SE WRIGHT:  That's understandable.

25             THE COURT:  All right.  Okay.  Good.

2:14-cr-357-APG-VCF - April 28, 2016

38

1          So, Mr. Maningo.

2          MR. MANINGO:  Thank you very much for that record and

3    that's the same thing I've discussed with Mr. Wright.  Thank

4    you, Your Honor.

5          THE COURT:  You're welcome.

6          MR. MANINGO:  I believe we're talking about Items 3

7    and 4 --

8          THE COURT:  Yes.

9          MR. MANINGO:  -- on Page 5.  I just wanted to suggest

10   on behalf of Mr. Wright that I believe Item No. 2, the same

11   argument applies.  Just in -- in Item 2, we're talking about

12   general previous robberies wherein Items 3 --

13         THE COURT:  You're talking the second Item 2, which

14   is where he's the mastermind about planning the robberies?

15         MR. MANINGO:  Oh, I'm sorry.  Yes, Your Honor.

16         THE COURT:  Okay.  The planning of robberies and

17   committed similar crimes previously.

18         MR. MANINGO:  Correct.

19         THE COURT:  Okay.

20         MR. MANINGO:  I think in the second Number 2, Number

21   3, and Number 4, all of those we're talking about the same idea

22   here --

23         THE COURT:  Yeah.

24         MR. MANINGO:  -- which is prior robberies and one,

25   Mr. Wright wants to argue that it's not inextricably

1    intertwined, that there's no nexus, necessarily, between those.

2    But more importantly, I believe the Government referenced a res

3    gestae argument in terms of 403 where we'd have to complete the

4    story.  We don't believe that any of this is necessary to

5    complete any story and that what it is, is just bootstrapping

6    allegations made by a cooperating witness of other robberies in

7    the -- with the intent possibly to taint the jury to think,

8    okay, because he did these other robberies, he probably did the

9    robberies that are in the Indictment.  We think it's highly

10   prejudicial and far more prejudicial than probative and that

11   the second Number 2, Number 3, and Number 4 should all be

12   excluded.

13           THE COURT:  And -- and to a limited degree I agree

14   with Mr. Wright, that it is highly prejudicial.  This is highly

15   prejudicial stuff.  Under Rule 403 what I have to balance is

16   does the prejudicial effect substantially outweigh the

17   probative value that it has.  I do see, in a vacuum, some

18   probative value here.  If -- and I'm trying to read into the

19   motion -- if the idea is Cole's story's going to be I met

20   Wright, he said I've been doing this all along, join my

21   conspiracy, join my gang, let's get together, I'll show you how

22   to do all this kind of stuff, I've robbed, I've done it before,

23   yeah, I spent some time in jail but, it's worth it, da, da, da,

24   da, da, if that's -- and that is what creates his joining a

25   conspiracy, there's probative value there I see.  I don't know

40

1   if that's true or not.  I don't know if that's what his story's

2   going to be.  I'm trying to infer from this motion that that's

3   in a sense what's going to be argued.  If that's the case,

4   there is probative value under the 403 analysis.

5           Under the intrinsically intertwined -- inextricably

6   intertwined, or also known as intrinsic evidence, 404(b)

7   wouldn't apply if it constitutes that and the question I have

8   is, is that part of the same transaction that forms the crime

9   charged or is it needed to tell the jury a complete and

10  comprehensive story.  It sounds, on the liquor store robbery,

11  like it could be.  I still want to think about that one for

12  awhile.  I have a little more information about that to help me

13  make that determination.  With regard to the Walgreens, I don't

14  have a date, I don't see how it's tied in.  So it's -- I can't

15  say yes, you can go into Walgreens unless I get more

16  information that we would conduct an out-of-court hearing --

17  out-of-jury presence hearing on.

18          So, with regard to Number 3 on the Walgreens, the

19  answer is as of now, you can't go into that.

20          On Number 4 regarding Lee's liquor store, I want to

21  think about that some more.  If there's a 302 or some piece of

22  information that you've disclosed on that that would help me

23  understand that a little better, I'd be happy to take a look at

24  that before I render a decision.  But, where I'm at is, on

25  Lee's liquor, I'm either going to allow it, if I can get to a

1    comfort level that it's not a 403 problem and that it's

2    inextricably intertwined.  If I can't get to that level, then

3    I'm going treat it like Walgreens and say we're going to have

4    to have an Evidentiary Hearing on that.  So let me -- I'm going

5    to think about that; I'm not going to rule today.  But if

6    you've got something to take a look at, I'll be happy to look

7    at that to help me understand that.

8                MR. DAMM:  Your Honor, I have the FBI 302 that I

9    referred to earlier and I have just a . . . a portion of the

10   Lee's liquor crime report and I'd tender those to the Court at

11   this time if I might.

12               THE COURT:  That would be -- that would be helpful.

13   Thank you.

14               And that's been produced to Mr. Wright, before.

15               MR. DAMM:  Yes, they're -- I can give him the bates

16   numbers.  In fact, I'll just give him an extra copy right now,

17   Your Honor.

18               PRO SE WRIGHT:  And, Your Honor . . .

19               THE COURT:  Yes, Mr. Wright.

20               PRO SE WRIGHT:  I want to add, if it's going to be an

21   Evidentiary Hearing on what the -- the Lee's liquor?

22               MR. MANINGO:  No, the Walgreens.

23               PRO SE WRIGHT:  On the Walgreens, I ask that the same

24   hearing is held on the Lee's liquor.

25               THE COURT:  I'm sorry, I didn't hear you.

42

1          PRO SE WRIGHT:  I said I ask if there's going to be a

2    hearing held on the Walgreens robbery, then I would ask the

3    same hearing held on the Lee's liquor.

4          THE COURT:  If I get to that point then we may have

5    to do both, yeah.  I suspect the Government's not -- you can

6    approach.  I suspect the Government's not going to want to take

7    the time to do the Evidentiary Hearing but, it's their case to

8    litigate so we'll have to see.

9          And is this a copy I can keep or do you need this

10   back?

11         MR. DAMM:  No, that's your copy, Your Honor.

12         THE COURT:  Thank you.  Thank you.

13         With regard to Number 5 on the Motion in Limine, that

14   Mr. Wright was engaging in pimp behavior, I've already ruled

15   that's out unless the Government wants to take -- convince me

16   otherwise.  I've ruled that out last October.  And I don't

17   think my mind has changed any but if you want to offer anything

18   new, I'll listen to you at this time and the same with Number 6

19   about Perreira engaging in prostitution.

20         MR. DAMM:  No objection, Your Honor.

21         THE COURT:  All right.

22         The last one is 7, that Wright made statements to

23   Cole that Wright had obtained numerous firearms since getting

24   out of prison, that he cannot go very long without possessing

25   firearms.

2:14-cr-357-APG-VCF - April 28, 2016

43

1          Since the case -- the Government has now dropped the

2     Felon in Possession of a Firearm charge, tell me how this is

3     still inextricably intertwined to the rest of the case.

4          MR. DAMM:  Your Honor, that information goes along

5     hand in hand with Item No. 2, that the firearms were an

6     integral part of the robberies in this case.  There were

7     firearms used in each of the three robberies and they were

8     provided to Mr. Cole -- provided to Mr. Cole by Mr. Wright

9     specifically and this is just . . . these were further

10    conversations between Mr. Cole and Mr. Wright in the course and

11    in furtherance of the conspiracy whereby Mr. Wright was

12    expressing his interest in always being in possession of a

13    firearm and providing a firearm to Mr. Cole in order to perfect

14    the robberies of the three jewelry stores in this case,

15    Your Honor.

16         THE COURT:  I -- I have . . . I don't have a problem

17    with the evidence coming in if Cole's going to testify that

18    Wright gave Cole the gun, guns plural.  Which is why I was okay

19    with it under Number 2.  If you tie the gun going from the hand

20    of Wright to the hand of Cole, you know -- possession I should

21    say, not hand necessarily but -- but this goes beyond that,

22    where Wright's saying I have lots of firearms, I can't go long

23    without a firearm.  I just -- I don't see how it's inextricably

24    intertwined.  I don't see how you have to have this to tell the

25    jury a comprehensive and complete story of the conspiracy.  And

1    I find it of very little probative value on the conspiracy and

2    robbery charges now that the felon in possession has been

3    dropped and I see a very prejudicial effect.  So I'm going to

4    rule it out under both, that it's not inextricably intertwined

5    and I have a problem with it under 403.

6            I will allow you -- like I said though, you can get

7    evidence in, if it's credible and offerable, that Wright gave

8    him the firearms that were used in the robberies.  That's tied

9    all together.  But this statement I just find not to be

10   inextricably intertwined and barred by 403.  So 7's out.

11           Those were the items mentioned in the Motion in

12   Limine regarding statements by Cole.

13           The motion regarding text messages --

14           MR. DAMM:  Your Honor, before we move to the text

15   messages --

16           THE COURT:  Sure.  Yeah.

17           MR. DAMM:  -- can I just make one request to the

18   Court.

19           THE COURT:  Um-hmm.

20           MR. DAMM:  Before Mr. Cole testifies, if we could

21   have the Court admonish him specifically with respect to the

22   drugs, and I suppose we ought to admonish him with respect to

23   the . . . the information about the firearms, Mr. Wright always

24   wanting to be in possession of a firearm.  If we could just

25   admonish him -- the Court could admonish him outside the

1    presence of the jury, I would appreciate that procedure of --

2            THE COURT:  If the -- if there's an appropriate way

3    and time to do that.  What I don't want to do is have him take

4    the stand and then I say, "Jury, excuse yourself for a second,"

5    I got to move them out, I give him, and we then bring them in.

6    If we can find the appropriate time to make that admonishment,

7    I think that makes sense.

8            MR. DAMM:  And -- and -- that's exactly what I would

9    suggest, Your Honor, is that before we bring him in in front of

10   the jury he be admonished.

11           THE COURT:  I would expect that the Government would

12   explain that to him as well when you meet with him before he

13   testifies and tell him I've ruled certain ways and . . .

14   You're looking quizzically like that's not going to happen.

15           MR. DAMM:  Well . . . he's in custody and . . . we'll

16   have to work out the mechanics of hopefully trying to meet with

17   him between now and tomorrow at 9 o'clock.  I . . .

18           THE COURT:  I -- I -- I appreciate the difficulty

19   but, keep in mind, this is a witness you're presenting and if

20   he goes off the rails and you haven't taken the appropriate

21   prophylactic effects, you run the risk of me declaring a

22   mistrial and -- I'm not -- I'm not saying I'm going to do it at

23   the drop of a hat obviously but, you're putting this witness

24   on, we've had these issues.  I'm presuming you're going to meet

25   with him and explain to him at some point the judge has ruled

46

1    you can't say this, you can't say that.  I'll try to give that

2    admonishment as well, but I want everybody to be clear, if he

3    goes off the rails, I don't want to see the Government throw up

4    its hands and say, "Gee, Judge, we had no idea" because I

5    suspect you would have if you'd have done it ahead of time.

6            Yes, Mr. Damm.

7            MR. DAMM:  I appreciate the Court's observations but,

8    with any witness, regardless of the amount of time we've had to

9    spend with that witness, regardless of the admonitions given to

10   that witness by the Government, regardless of the admonitions

11   given to that witness by that witness' attorney, regardless of

12   the admonitions given to that witness by the Court,

13   notwithstanding all of those admonitions, none of the parties

14   involved can guarantee what a witness may see --

15           THE COURT:  Of course.  I acknowledge that.

16           MR. DAMM:  -- and I wouldn't want the Court to infer

17   that simply because a witness says something, that that conduct

18   is attributable to the Government.

19           THE COURT:  I'm not saying it is.  I didn't -- if

20   I -- if that's what I implied, I meant -- I apologize.  That

21   wasn't the intent.  My suggestion though was that I would

22   presume the Government is going to meet with him at some point,

23   however brief, before he walks into court to testify and that

24   you would pass on to him the message and the strong admonition

25   yourself that these areas are off limits and Mr. Cole can't say

1    these things.  If he does, he runs the risk of being held in

2    contempt.

3         Now, if it appears to me that he's doing it at the

4    Government's bequest, request, or if he's doing this and the

5    Government hadn't properly warned him or admonished him about

6    that, that's a different issue.  I expect that's not going to

7    be the case.  I expect you'll appropriately warn him, but

8    obviously if I've ordered it out and you've admonished him and

9    I admonished him, if it seems to me he's doing this on his own

10   personal vendetta or something, he runs the risk of contempt.

11        MR. DAMM:  And that's fair enough.  And in addition,

12   we expect his counsel to meet with him and provide him those

13   same admonitions.

14        THE COURT:  There's a woman standing up in the

15   gallery who I don't know and I don't know why she's here.

16        MS. RASMUSSEN:  I represent Mr. --

17        COURT REPORTER:  You need to come to a microphone.

18        THE COURT:  You need to come to the microphone,

19   ma'am.

20        MS. RASMUSSEN:  Thank you, Your Honor.

21   Lisa Rasmussen and I represent Mr. Cole.

22        THE COURT:  Okay.  Thank you.

23        MS. RASMUSSEN:  And I -- I understand that you're

24   making rulings this morning on certain things that are and are

25   not admissible.  I, at 9:30, had a hearing in front of

48

1    Judge Foley and so I left right after you started and I just

2    walked back in the door.

3             THE COURT:  Okay.

4             MS. RASMUSSEN:  So, I want to be very clear and I'm

5    not going to ask you to repeat, I don't want to waste your

6    time, I'll find out the rulings from them.  I will be meeting

7    with my client this afternoon, but I am, of course, very

8    concerned now when you're talking about holding my client in

9    contempt.

10            THE COURT:  I -- I appreciate that and I did that for

11   a reason.  Because I want everybody to understand -- you don't

12   know the whole history of this case, but . . . I have ruled

13   Mr. Cole can't talk about certain things.  There were -- there

14   was apparently some allegations that he may -- was going to

15   testify to that he and Mr. Wright smoked marijuana together,

16   did other drugs together.

17            MS. RASMUSSEN:  Got it.

18            THE COURT:  I've said that doesn't come in.  There's

19   some other issues that I've ruled that they can't -- he can't

20   testify about, for various reasons, 403, et cetera.  You're

21   familiar with that.  And, so, I'm not suggesting that if he

22   says that and it just comes out accidentally I'm going to hold

23   him in contempt.  Obviously though, like I said, if I get the

24   sense that there's some personal vendetta, he's trying to get

25   back at Wright or the Government, or he's doing some

49

 1    shenanigans, he needs to understand that the Court has contempt

 2    power if I think he's misbehaving on purpose and causing

 3    trouble.

 4              MS. RASMUSSEN:  Okay.

 5              THE COURT:  I don't anticipate that's going to be a

 6    problem.

 7              MS. RASMUSSEN:  Okay.  I just -- the Court --

 8    obviously the Court knows, I do this for a living.  I'm

 9    normally sitting here.  So I understand other bad acts, I know

10    what they are, and I will find out the rulings for them and I

11    will convey them.

12              THE COURT:  I appreciate that.  Some of them --

13              MS. RASMUSSEN:  And I will also be here when he

14    testifies.

15              THE COURT:  I appreciate that.  Thank you,

16    Ms. Rasmussen.

17              MS. RASMUSSEN:  Okay.  Thank you.

18              THE COURT:  Thank you.

19              All right.  So, Mr. Damm, does that address the --

20    we're all clear?

21              MR. DAMM:  Yes.  Thank you, Your Honor.

22              THE COURT:  And if we can find -- let's try and look

23    for the appropriate time, outside the jury's presence when

24    Mr. Cole is here so that I can put on the record and make sure

25    I emphasize to him, you need to behave.  Not that he won't, but

2:14-cr-357-APG-VCF - April 28, 2016

50

1    it always -- I agree with you, it always helps to have an

2    admonition given when there's potential problems that may come

3    up.

4           MR. DAMM:  We appreciate the Court's consideration.

5           THE COURT:  Thanks for raising that issue.

6           All right.  So with regard to the text messages, like

7    I said before, I didn't have the adequate foundation or

8    authentication laid in the motion so I'm not saying that

9    they're automatically coming in.  Government will have the

10   opportunity to do that.  But it occurred to me that I wanted to

11   kind of give you a warning.  This is an issue that I was

12   concerned about and so you can think about ahead of time.  And

13   now that Ms. Perreira is testifying, it takes away some of the

14   confrontation clause problems.  It takes away some of the

15   hearsay problems.  If she testifies.  She's on your list.  I

16   don't know if she will or won't.  But to the extent that the

17   texts -- if you're going to try and get in text messages, some

18   of those I noticed appeared to be in June.

19          Now, the Indictment says that the conspiracy began on

20   a date unknown, but not later than April 28th and continuing

21   through on or about May 20th.  We have a jury instruction on

22   "on or about" means a reasonable period of time.  So, you know,

23   I'm not going to sit here and rule this date is the cutoff date

24   but, I want you to be aware that the further beyond May 20th we

25   get, the harder -- or the greater burden or the greater

1    relevance and tying into the conspiracy you're going to have to

2    show to make sure it's part of this conspiracy, if you're

3    trying to get it in as a co-conspirator's hearsay statement.

4    And if this -- I think one of them is like June 6th, which is

5    17 days after the conspiracy ended, on or about, and the

6    conspiracy itself lasted apparently 22 days.  You're almost

7    saying that the "on or about" is double -- or the same length

8    of time as the conspiracy time.  I'm just giving you a

9    heads-up.  If you're going to June 6th, you're going to need to

10   really convince me this is part of the conspiracy still so that

11   it's not a hearsay problem.  Now maybe this isn't an issue

12   because she's going to -- if she testifies but, I just wanted

13   to preview that issue so that everybody's aware that it's not

14   going to be simply authenticate, everything comes in.

15   Authentication is one thing.  There's still a potential hearsay

16   problem that will have to be resolved.

17            Don't need an answer now, I just wanted to put

18   everybody on notice that's a potential problem.  So -- and the

19   same thing beforehand.  It says a date unknown but not later

20   than April 28th.  If you're talking a year before, I'm going to

21   have a hard time seeing how that's part of a conspiracy.  Just

22   want everybody aware of that.

23            Do you understand that, Mr. Wright?

24            PRO SE WRIGHT:  Yes, Your Honor.

25            THE COURT:  All right.  Just so we're aware of that.

2:14-cr-357-APG-VCF - April 28, 2016

52

1           Other than that, I couldn't think of anything else

2    that I felt like I needed to preview on the text issues.  I'm

3    going to wait to see if the Government is going to lay the

4    authentication foundation and then we'll go from there how you

5    do that.  Okay.

6           Any other issues on the text messages before I move

7    on from there?

8           MR. DAMM:  No.  Thank you, Your Honor.

9           THE COURT:  Okay.  Mr. Wright, anything further on

10   the text -- anything additional on the text messages issues we

11   need to address now?  I haven't let them put them in.  I'm

12   going to see what they can do at trial.  You understand that?

13          PRO SE WRIGHT:  Yes, Your Honor.

14          THE COURT:  All right.

15          PRO SE WRIGHT:  Your Honor, at this time may I

16   request that the Court have a hearing outside the presence of

17   the jury.  I had filed a motion awhile back regarding

18   801(d)(2)(E) but basically under *Krulewitch* and BOO-JA-LAY,

19   proof that there was a conspiracy because now what we're saying

20   is the bootstrapping rule.  Basically since, you know, this

21   man -- one man's saying something, there's no independent

22   evidence to even prove that it was a conspiracy, Your Honor.

23   So I'm asking that a hearing be held on the fact that there is

24   no evidence saying that it was a conspiracy besides Cole's

25   statements.

1           THE COURT:  Well . . .

2           PRO SE WRIGHT:  I'm being like bootstrapped to his

3      conspiracy and going to trial on it.  I don't understand that.

4           THE COURT:  I'm sensitive to that argument.  Let

5      me -- let me respond this way.

6               This is not an issue that to me should be a surprise

7      to you because you've known all along they're arguing aiding

8      and abetting and conspiracy.  So, as I said to the Government,

9      this is something that should have been raised 30 days ago.  If

10     you'd have done that, we could have addressed this prior --

11     wait a second.  Prior to the jury coming in.

12              Now, if you want to do that, like I offered the

13     Government, we can have that Evidentiary Hearing outside the

14     presence of the Government -- the jury.  It would count against

15     their time.  If you want me to do this, I'm not going to count

16     that against the Government's time.

17              Now, the second issue on that is -- and it may delay

18     the trial.  So you need to think about that also.  The bigger

19     issue in my mind is it's not necessarily something that has to

20     be resolved prior to the trial starting.  During the trial the

21     Government has the burden of proof to show that the conspiracy

22     existed before it can get in statements of a co-conspirator.

23     If they don't show that, then they don't come in.  But that's a

24     hearsay objection.  If Mr. Cole gets on the stand and

25     testifies, the hearsay rule doesn't apply because it's now not

54

1    an out-of-court statement.  He's in court, testifying about

2    what he can say and you can cross-examine him.  So that hearsay

3    rule doesn't apply to his testimony.  If he says something

4    about Perreira told me about Wright saying this, then there's a

5    conspiracy issue that has to be resolved and the Government's

6    going to have to show that Cole was a conspirator, you were a

7    conspirator, and Perreira was a conspirator and that way it's a

8    co-conspirator statement.  And the Government will bear the

9    burden on that burden of proof before the statement by Perreira

10   comes in.

11          There's an alternative ground and that is I can let

12   the evidence come in, subject to the Government tying it up

13   that there's a conspiracy later.  I'm not inclined to do that

14   the way this case has progressed and the way I'm fearful of

15   this testimony that's all going to come in.  No offense to any

16   person or witness.  But I'm not inclined to allow that.  So as

17   I sit here, the Government's going to have to demonstrate the

18   conspiracy.  But I don't think that's going to be an issue

19   because Cole's going to be here and presumably at least

20   Perreira's on the witness list.  Her statements too would not

21   be hearsay because they'll be in court.  Okay?

22          PRO SE WRIGHT:  That's good, Your Honor.  That's

23   perfect.

24          THE COURT:  So, if you decide you want to have that

25   hearing, let me know -- think about it and let me know before

55

1   we finish today because that's going to affect how we do

2   things.

3            PRO SE WRIGHT:  Okay.

4            THE COURT:  Understood?  All right.

5            Anything else?  Government want to chime in?  Any

6   agreement?  Objection?

7            MR. POMERANTZ:  No, sir.

8            THE COURT:  All right.  Okay.  That dealt with the

9   text messages.  Those were the outstanding Motions in Limine.

10           Bear with me for a minute while I get myself

11  organized again.

12           (Brief pause in proceedings.)

13           Now, let's move to the exhibit list.  As I mentioned

14  earlier, there was an exhibit list filed Tuesday, another

15  exhibit list filed yesterday.  On yesterday's list there are

16  three exhibits that were not on Tuesday's list.  More

17  importantly, one exhibit on yesterday's list was not even on

18  the exhibit list that was filed on Monday.  I have a problem

19  with that.  Specifically, it's Exhibit 5A.1 described as MJ

20  Christensen Boca Park summary surveillance disk 4-29-14.  That

21  was not on the list that was provided on Monday.

22           If you intend to still go forward with that exhibit,

23  I need to know why and why it's fair to allow this late --

24  because I didn't give time for you guys to prepare, I gave time

25  for Wright to prepare.  In addition, those other two exhibits

2:14-cr-357-APG-VCF - April 28, 2016

56

1    that were not on the Tuesday list were 18B and C, cartridges --

2    43 cartridges and seven cartridges.

3             PRO SE WRIGHT:  Your Honor, at this time I would like

4    to move to strike any exhibits that wasn't presented

5    previously.

6             THE COURT:  Okay.  Ms. Frayn?  Mr. Damm?

7    Mr. Pomerantz?

8             MR. DAMM:  Your Honor, with respect to Exhibit 5A, I

9    believe it's 5A.1, 5A.1 is simply a -- a small subset of 5A.

10            THE COURT:  Okay.

11            MR. DAMM:  As I understand it, 5A is a . . . a . . .

12   well, let me back up.

13            The surveillance cameras at the MJ Christensen

14   jewelry store are captured -- there are a number of

15   surveillance . . . cameras that capture individual scenes.

16   They are all contained within Exhibit 5A.  What we did to

17   streamline the process is to develop a short clip, I think it's

18   only like a minute or so, which is contained in Exhibit 5A.1.

19   So it's just a small subset of Exhibit 5A.  So we're not adding

20   anything new --

21            THE COURT:  Okay.

22            MR. DAMM:  -- we're just condensing what had

23   previously been provided to the defendant and previously been

24   contained on our exhibit list.

25            THE COURT:  That's what I was getting but I wanted to

2:14-cr-357-APG-VCF - April 28, 2016

57

1      make sure that was the case.  So it's -- so the record's clear,

2      5A.1 is a snippet or clip of the larger 5A?

3                  MR. DAMM:  Correct.

4                  THE COURT:  Reduced for efficiency purposes to

5      present?

6                  MR. DAMM:  Correct.

7                  THE COURT:  Okay.

8                  MR. MANINGO:  Your Honor, if we could just ask, has

9      it been modified at all in terms of being enhanced or blown up

10     or different angle or anything like that?

11                 MS. FRAYN:  Your Honor, I sat with Ms. King when she

12     put that together and what we -- what we did for -- so that it

13     will be clear to the jury, is in between changing camera shots,

14     we put a period of black space so that the jury would know that

15     it was changed.  Other than that alteration, nothing was

16     altered.

17                 THE COURT:  Okay.  Thank you.

18                 (Discussion at defense table.)

19                 THE COURT:  And 18B and C, those were not on the --

20     on the -- they were on the original list, but they weren't on

21     the Tuesday list.  Was that just an oversight or what's the --

22                 MS. FRAYN:  No.  I don't have the files.  Can I look

23     at the Court's -- does the Court have a file stamp copy?  We

24     have a draft.  There's been so many I just don't -- I think

25     it's just a renumbering issue, not that they weren't on there.

1              May I approach?

2              THE COURT:  My -- my clerks went through and tried to

3    match it up and they said this was not on Tuesday's but let me

4    hand it down.

5              Melissa.

6              MS. FRAYN:  Thank you.

7              THE COURT:  Mr. Wright, with regard to the video

8    summary, any objection --

9              PRO SE WRIGHT:  No objection to 5 -- 5A.1.

10             THE COURT:  Okay.

11             MS. FRAYN:  Your Honor, really what I need is the

12   first version that we --

13             THE COURT:  I have the original one.  I don't have

14   the Tuesday version with me right now.

15             THE COURT:  Okay.  So if you want to go back and

16   compare --

17             MS. FRAYN:  Okay.  Can the -- can we go back -- can I

18   provide an answer to the Court once I can go back and compare,

19   Your Honor?

20             THE COURT:  Yeah.  We can discuss it tomorrow morning

21   some time during the trial and get that resolved.  I'm going to

22   hold off on whether that comes in or not at this stage.  Okay.

23             So that's an open issue.  Fair enough.

24             MR. DAMM:  Your Honor, just for my edification, the

25   Court's concern is that the Court believes that those items

1       were not on any exhibit list?

2              THE COURT:  No.  No.  No.  5A.1 was not on any prior.

3       18B and C were on the original, but they -- on the Monday list,

4       they weren't on the Tuesday list.  And they showed up on the

5       Wednesday, but not on the Tuesday.  It's the two -- it's the

6       cartridges, 43 cartridges of .38 special and seven cartridges

7       of .45 caliber.  We didn't see them on the Tuesday list, but

8       they are on the Wednesday.

9              Check it out and find out.  If I'm wrong, if we made

10      a mistake, so be it.

11             MS. FRAYN:  It may have just been a mistake that was

12      corrected.

13             THE COURT:  Could be.  And that's what I'm just

14      trying to figure out.

15             MS. FRAYN:  And I would make clear to the Court,

16      these are physical items that were seized from a search that

17      have been disclosed for a very long time to Mr. Wright.

18             THE COURT:  Okay.  Yeah, I don't anticipate it's

19      prejudicial given the quick time you caught it, but I just

20      wanted to make sure everybody was aware that was the only issue

21      I had.  The bigger issue -- question I had was on 5A.1 because

22      it's brand new, but I get that and that makes sense and I'm

23      okay with that.

24             MS. FRAYN:  Can I bring something to the Court's

25      attention and to --

1          THE COURT:  Please.

2          MS. FRAYN:  Because we've -- okay.  Wait.  There are

3     two issues.  There will be, if there has not been already on

4     this version, there are summary -- we did the same thing.  I

5     think maybe it is contained in the exhibit list but, to be

6     clear --

7          THE COURT:  Okay.

8          MS. FRAYN:  -- we made clips, summary clips for each

9     of the three robberies going through the same process; taking

10    the multi-camera disk and then condensing it down to a very

11    short clip with black spaces to indicate where the camera

12    change happened.  And so, I believe they are on there.  If they

13    are not --

14         THE COURT:  Yeah.  And just to confirm that.  On the

15    original one that was handed to me on Monday, Page 3 references

16    MJ Christensen Eastern summary surveillance disk 5-19-14.  So

17    that was on there.

18         MS. FRAYN:  And there should be a Jared's one as

19    well, which I think is on there as well.

20         THE COURT:  I think that's right, too.

21         MS. FRAYN:  Okay.

22         THE COURT:  I just wanted to point out this is the

23    only new one.  I got the explanation and I'm okay with it.

24         MS. FRAYN:  So, there is going to be a similar

25    addition for -- relating to the text messages.  And if I can

1    just bring this to the Court's attention.

2              THE COURT:  Sure.

3              MS. FRAYN:  So, seize a phone.  Impound it into

4    evidence.  Forensic examiner takes it out of evidence, performs

5    a forensic exam.  Creates second piece of evidence being the

6    forensic exam.  Okay.  That forensic exam is on disk, okay, and

7    is sometimes several thousand pages long.  What is relevant, in

8    the Government's belief, is the very few text messages that we

9    are trying to authenticate and admit.  Someone is going to --

10   the person who did the forensic exam, we anticipate, is going

11   to be able to say, "Yes, I did this exam and I've looked in

12   here and confirmed that these four pages of text messages are

13   contained within my exam."  But we don't want the jury to have

14   to mess with the disk with 4,000 pages and so we're making a

15   23.A1, which is just the three or four pages that would come

16   off that disk.

17             THE COURT:  You're doing a -- you're making a new

18   exhibit of the relevant texts --

19             MS. FRAYN:  Yes.

20             THE COURT:  -- and you're going to exclude all of the

21   irrelevant stuff that was found on the phone?

22             MS. FRAYN:  And they're redacting all of the

23   surrounding texts around it.  We have done that process.  We

24   just didn't get it into the exhibit list.  And I think Ms. King

25   got it into the defendant's binders that way --

2:14-cr-357-APG-VCF - April 28, 2016

62

1        THE COURT:  Okay.

2        MS. FRAYN:  -- so that they know the relevant pages.

3        THE COURT:  Okay.

4        MS. FRAYN:  But it's just not in the list yet.

5        THE COURT:  I appreciate that.

6        MS. FRAYN:  I don't want the Court to be concerned

7   that we were doing something untoward.

8        THE COURT:  I appreciate the heads-up.  No, thank you

9   for giving me that heads-up.  As long as the information has

10  been produced and listed and now you're just sort of distilling

11  it down.

12       MS. FRAYN:  And for the record, the Government did,

13  at Mr. Wright's request, provide two sets of what we anticipate

14  our evidence binders tomorrow to be.

15       THE COURT:  Okay.

16       MS. FRAYN:  And I've told Mr. Maningo if there's any

17  last minute small changes, I will immediately let him know and

18  we anticipate bringing the Court's copies to wherever you

19  direct me to bring them a little bit later this afternoon.

20       THE COURT:  I appreciate that.  Thank you for that.

21       All right.  Let me move on to the next issue and that

22  is now that Ms. Perreira has pleaded to a charge and is no

23  longer part of this trial, I'm going to read to the jury an

24  instruction tomorrow morning.  It's pulled off of model --

25  Ninth Circuit Model Jury Instruction 2.14 and it says as

63

1    follows.  I want to give you a heads-up and let me know if

2    there's any problem with this.

3            I'll tell the jury, "For reasons that do not concern

4    you, the case against co-defendant Danielle Perreira is no

5    longer before you.  Do not speculate why.  This fact should not

6    influence your consideration of the charges against Mr. Wright

7    and you must base your verdicts solely on the evidence against

8    Mr. Wright."

9            That's model rule 2.14 from the Ninth Circuit that

10   I've modified a little bit.

11           Mr. Pomerantz.

12           MR. POMERANTZ:  United States thinks that's perfect,

13   Your Honor.

14           THE COURT:  Okay.  Thank you.

15           Mr. Wright, any problem with that?

16           PRO SE WRIGHT:  No, Your Honor.

17           THE COURT:  All right.  So I'll read that first thing

18   tomorrow morning to the jury so that they understand why

19   Ms. Perreira is no longer here.

20           Last issue I had on my -- well, I shouldn't say

21   that's the last.  That's not true.

22           The next issue on my list is the instructions, jury

23   instructions.  I have gone through and taken the parties' -- I

24   and my staff have gone through and taken the parties'

25   instructions and coalesced them and combined them and modified

2:14-cr-357-APG-VCF - April 28, 2016

64

1    them and I've got drafts to hand out.  So I'll distribute

2    those.  But I want -- I need some clarification from the

3    Government first.

4          The Government's jury instructions don't include an

5    instruction on brandishing.  Now, I know there's a -- that's

6    part of the Indictment, is brandishing or using.  But there's

7    no instruction on that and so is the Government no longer

8    seeking a brandishing charge or instruction?  Is it just

9    possession or use?

10          MR. POMERANTZ:  Your Honor, the United States is

11    seeking an instruction on brandishing and with the Court's

12    permission it will provide you with a proposed instruction and

13    we'll copy Mr. Maningo on that.  If I may e-mail that to

14    chambers.

15          THE COURT:  Okay.  That's fine.

16          And what I'm going to do -- my intent, what I'll do

17    is I'll hand out the jury instructions, draft, today, before

18    everybody leaves.  That way you've got until tonight, tomorrow,

19    and then typically what I try to do is settle those jury

20    instructions at an appropriate time so you can incorporate them

21    into your closing arguments.  So my thinking is then we'll

22    settle these tomorrow afternoon when we're -- near the end of

23    the day.  Whenever we send the jury home, we can stick around

24    and resolve any disputes on that.

25          Mr. Damm.

2:14-cr-357-APG-VCF - April 28, 2016

65

1          MR. DAMM:  Your Honor, I -- is the Court presuming

2     that Mr. Wright's not putting on a defense?

3          THE COURT:  I'm not making that presumption at all

4     but my thought is that we can get most of these hashed out in

5     that block of time at the end of the day Friday --

6          MR. DAMM:  Okay.

7          THE COURT:  -- and then if we need to do final

8     tweaking, depending what he puts in.  What I don't want to

9     do is --

10         MR. DAMM:  I've got you.  I understand.

11         THE COURT:  Yeah.  Yeah.  Yeah.  I'm anticipating

12     he's going to put a case on and that's his right.

13         MR. DAMM:  We'll -- we'll -- we'll be ready with the

14     jury instructions at the conclusion of his case.

15         THE COURT:  Yes.  Yeah.  What I'm trying to avoid is

16     a lengthy delay between the time Mr. Wright finishes his case,

17     the Government puts on any rebuttal case, and then we have to

18     wait several hours or half a day to settle instructions while

19     the jury is cooling their heels or I have to send them home.

20     I'd rather, if we've got a chunk of time tomorrow afternoon and

21     if we don't, if we run late tomorrow afternoon and we don't

22     have time, okay.  We'll figure out when to work it in.  But I

23     want everybody ready to discuss jury instructions tomorrow late

24     afternoon if we have the time to do that.

25         MR. DAMM:  So Mr. Wright would not begin his case

1    until Monday morning?

2              THE COURT:  It depends.  If the Government rests and

3    we've got time and he's ready to go, we can go into this

4    starting Monday -- we can just start Friday afternoon.  Every

5    delay we can avoid is fine.  But it seemed to me we've got a

6    gap and we could fill that with instructions if --

7              MR. MANINGO:  I was just going to say, Your Honor,

8    because the subpoenas issues with Mr. Wright and all the

9    witnesses contacting my office and us doing the best we

10   could --

11             THE COURT:  Yeah.

12             MR. MANINGO:  -- we didn't tell any witnesses to come

13   Friday evening.

14             THE COURT:  That's fine.

15             MR. MANINGO:  Just to let everyone know.

16             THE COURT:  Okay.  So Mr. Wright will not put on a

17   case Friday afternoon.  He may give an opening statement at the

18   end of your case-in-chief if he doesn't do it at the beginning,

19   but once the Government's case is done, if we have a chunk of

20   time tomorrow afternoon, we'll settle jury instructions as best

21   we can depending upon what Mr. Wright does.  We'll obviously

22   have to take one in or out if he testifies or doesn't testify

23   that will be resolved at the last minute.

24             So, just at least plan on -- let's plan on settling

25   jury instructions on Friday afternoon.  And then so if you can

1    send over a brandishing one at some point, just get it over to

2    us and we'll try and incorporate that in.  It won't be in what

3    I'm handing out today but you'll at least have an idea of where

4    we're at.

5            Question -- I'm sorry.

6            (Brief pause in proceedings.)

7            I have a question for the Government before Count

8    No. Three.  So on Count No. Three, in the Indictment it says

9    that -- it charges Interference with Commerce by Robbery, that

10   on or about May 8 Mr. Wright unlawfully obstructed, delayed

11   commerce, by robbery, and the top of Page 3, "and that the

12   defendants did unlawfully take and obtain property consisting

13   of jewelry and other property, from the persons of MC and BW,

14   employees of Jared's Galleria of Jewelry" at the Rainbow

15   address against their will.  The jury instruction the

16   Government submitted is similar to that and what I'm -- and

17   when I read the statement of the case draft, everybody seemed

18   to be okay with that, but I realize there was a lot going on

19   that morning so maybe it wasn't caught or maybe everything is

20   okay and I just -- but I want to make sure that we're all on

21   the same page about what that charge is.  Is the . . . yeah.

22   Because in the Government's proposed Hobbs Act Interference

23   with Commerce by Robbery instruction the first element is that

24   the defendant obtained jewelry and other property from MC and

25   BW without their consent.

1           Is the Government saying that the robbery was of

2  those two individuals, that their property and jewelry were

3  taken against their will, or is it that the Government's saying

4  that the jewelry and other property was taken from Jared's as

5  opposed to from MC and BW?  Clarification.

6           MS. FRAYN:  Your Honor, the property, the jewelry and

7  the other items belonged to Jared's, but they were obtained by

8  gunpoint from the Jared employees MC and BW.

9           THE COURT:  And -- and -- and that's what my clerks

10  explained to me they believed and I was pretty sure that's

11  where you were going.

12           MS. FRAYN:  So, yes, they were obtained from those

13  individuals but the property did not belong necessarily to

14  them.

15           THE COURT:  Was Jared's -- it was Jared's property

16  taken from the persons of those two employees who were there

17  allegedly at gunpoint.

18           MS. FRAYN:  Yes.

19           THE COURT:  And -- and I raise this because you'll

20  see in my proposed jury instruction on Page 16, the Hobbs Act,

21  I've copied your language but I'm thinking, so that the jury

22  understands, because I could -- as I was going through it,

23  reading it, boy, you could interpret that a different way, it

24  may be worthwhile saying in the jury instruction the defendant

25  obtained jewelry and other property belonging to Jared's from

69

1    MC and BW without their consent.

2          Look at that instruction.  It's Page 16, the first

3    element of the Hobbs Act.  I just want to make sure that the

4    jury will understand and it's clear, that was what I was

5    concerned about when I looked at that last night.  So, we can

6    hash that out Friday afternoon, you know, whenever we settle

7    the jury instructions, but I want to make sure that that's

8    clear.

9          MS. FRAYN:  Yes, sir.

10          THE COURT:  That the robbery is of Jared's.  You're

11    not charging him with the MJ Christensen two robberies, you're

12    only charging him with the Jared's.

13          MS. FRAYN:  The substantive offense, yes.

14          THE COURT:  The substantive, yes.

15          MS. FRAYN:  We're not limiting the conspiracy to just

16    that one.

17          THE COURT:  No.  No.  No.  No.  Not at all.  This is

18    just on the Hobbs Act Count Three.  But I think for the jury

19    instruction it may be better to clarify that language.  I

20    didn't do it yet, but that's something we ought to talk about

21    on Friday.

22          All right.  Melissa . . .

23          Ms. Johansen is going to hand out my draft jury

24    instructions and verdict forms so that you all can take a look

25    at those in the next 24 to 36 hours and then we'll talk about

2:14-cr-357-APG-VCF - April 28, 2016

70

1      them.  There should be two for each side.

2            Last item I have is timing now for tomorrow.  Jury

3      will be here, we'll start at 9:00 a.m. with opening statements.

4      I'll give a short opening instructions to the jury and then

5      we'll go with openings.

6            How much time does each side think they need for

7      opening statements?

8            MR. POMERANTZ:  Approximately 15 minutes, Your Honor.

9            THE COURT:  Okay.

10           Mr. Wright, are you at this point thinking you're

11     going to make an opening statement right after the Government

12     does or do you want to reserve your opening statement until

13     after they rest and you start your case-in-chief?

14           (Discussion at defense table).

15           PRO SE WRIGHT:  Right after -- right after the

16     Government makes their opening statement, Your Honor.

17           THE COURT:  Okay.  And how much time do you

18     anticipate needing for your opening statement?

19           PRO SE WRIGHT:  Not much longer than the Government,

20     Your Honor.  Probably 15 to 30, in between there.

21           THE COURT:  All right.  I'm going to -- I'm going to

22     . . . let's make it 15.  If you were a lawyer, I would probably

23     say you don't need more than 15 minutes to give an opening

24     statement.  If it goes a minute or two over, I'm not going to

25     hold you to it but I don't think a 30-minute opening is needed

1    in a case like this.  But I'll give you a reasonable period of

2    time.  Like I said, again, not casting any aspersions or not

3    suggesting anything is going to happen but, if I feel like

4    you're wasting the Government's time and eating into their

5    clock, I'm going to give them extra time on the back end.  So,

6    just make sure that you're streamlined and you're -- let me

7    assure you, I'm not picking on you because you're

8    unrepresented.  I say this to almost every attorney that's in

9    here.  The trials have to be streamlined.  The jury gets upset

10   if they feel like their time's being wasted and you can never

11   predict -- sometimes you can.  Usually it's hard to predict who

12   they're going to hold it against if they feel like their time's

13   being wasted.  And that means sitting around back in the jury

14   room while we're hashing things out or it means going on and on

15   with direct or cross on stuff that has been rehashed and

16   rehashed or it means wasting time in arguments.  So I advise

17   everybody, besides the fact that we're on a short time frame,

18   for the jury purposes, they don't want to waste time.  So, if I

19   feel like that's happening, I'm certainly going to add time to

20   the Government's side and make sure that that doesn't happen

21   and that they're not wasting everybody else's time as well.

22          Enough said on that.

23          With regard to -- and I'll be clear.  I apologize you

24   were shackled on Monday.  I thought I had gotten the word back.

25   That was my fault not to get the Marshal's Office notice for

1    that but, I don't intend to have you shackled tomorrow and

2    people can speak from the podium.  You can give openings and

3    closings and cross-exams and directs from the podium.  But I

4    don't want anybody approaching a witness with an exhibit.  If

5    you need to show an exhibit to a witness, from either side,

6    I'll have my clerk or, Ms. Johansen, somebody will -- just say,

7    "Hey, I've got something to show" and they'll come down and

8    take it and give it to the witness.  They should have the

9    exhibit books up here so alls you need to do is refer to

10   exhibit this or that or the other and we'll have the booklets

11   here for them but if there's a new demonstrative exhibit or

12   something you want to point out, we'll do it that way.  But you

13   can use the podium, both sides can use the podium for direct

14   and cross and openings and the like.  I think it will be a

15   little better for the jury.

16          Anything else we need to cover?  I've exhausted my

17   list.

18          MS. FRAYN:  Your Honor, if I may.

19          THE COURT:  Yes.

20          MS. FRAYN:  When we were talking witnesses and

21   witnesses that the defense intended to call, there was a

22   federal agent McPeak that the defendant had subpoenaed and I

23   inquired after that of Mr. McPeak, his availability, and I

24   would advise to the defendant and the Court, Mr. McPeak is out

25   of district working on the Attorney General's security detail

1    and will not be back until the 9th.  And he can't -- he cannot

2    leave the security detail at this point.

3          I would note to the Court that -- and the defendant

4    that subpoenaing a federal agent requires certain things to be

5    met so that the requirement is in compliance with *Touhy*

6    provisions.  I do not believe that the defendant has met those

7    requirements.  I wanted to bring this to the Court's attention

8    because, of course, Agent McPeak does not want to be in

9    violation of a court order.

10          THE COURT:  Was he involved in this case?  What was

11   his involvement?

12          MS. FRAYN:  Well, and if you'll remember, Your Honor,

13   I had previously raised this and said the Court may need to

14   excuse the Government and ask the defendant what his intent was

15   because it seemed, in the pleading papers, that his focus on

16   Agent McPeak was surrounding what testimony was put in the

17   Grand Jury, which the Court has already ruled is not going to

18   be coming into the jury.

19          So, I can tell you that the primary investigating

20   agencies in this matter were Henderson Police Department and

21   Metro Police Department.  The FBI adopted the case federally.

22   It was primarily assigned Agent McPeak's responsibility but he

23   was very tangentially involved in any part of active

24   investigation.

25          If -- if the defendant wants to tell the Court or

1     tell us now what he anticipates he wants to ask, I can tell the

2     Court whether Mr. -- whether Agent McPeak can even address

3     that.  But, he really wasn't part of the investigation.  He

4     wasn't talking to witnesses during the robberies.  That was all

5     done at the state level before the case came over federally.

6                THE COURT:  And he's not on your witness list?

7                MS. FRAYN:  He is not.

8                THE COURT:  What did he do once he took over?  You

9     said he was tangentially involved.  Were his underlings doing

10    it -- are they going to testify it -- was Officer Mahan doing

11    that or what's the --

12                MS. FRAYN:  Well, I mean, so once it came federally,

13    Agent McPeak helped gather and funnel discovery to the

14    Government.

15                THE COURT:  Okay.  He's a coordinator in a sense?

16                MS. FRAYN:  He wrote various 302s to document

17    contacts that were made.  In fact, he wrote the 302 -- authored

18    the 302 that Mr. Damm handed up to the Court about

19    Mr. Cole's . . . August 4th, 2015, discussion with the

20    Government.

21                He did some investigation for -- at our request, some

22    follow-up, which did not culminate in anything that we believed

23    was relevant or admissible.  He began the process of attempting

24    to find Tonya Fred, but Agent Mahan here at counsel table

25    picked that ball up late last Friday and did all of the heavy

1    lifting to actually locate Ms. Fred some time Saturday

2    afternoon.

3            There was -- and I'm just trying to do this off the

4    top of my head, Your Honor.

5            THE COURT:  Sure.  Understood.  That's fine.

6            MS. FRAYN:  Clearly I can't tell you each and every

7    thing he did.

8            THE COURT:  Understood.

9            MS. FRAYN:  I know there was an allegation that

10   Ms. Rasmussen brought to our attention about a disturbance that

11   happened at Mr. Cole's family's rental property in Las Vegas

12   and I know that he did some follow-up investigation into that

13   and -- and we don't believe that there was anything relevant or

14   admissible that came as a result of that portion of the

15   investigation.

16           I also know that he did some follow-up to the Lee's

17   liquor store robbery.  But the Government doesn't intend to

18   admit any of that portion of the investigation.

19           I think . . .

20           (Discussion at Government table.)

21           MS. FRAYN:  Excuse -- the Court's indulgence,

22   Your Honor.

23           THE COURT:  Sure.  Sure.

24           (Discussion at Government table.)

25           MS. FRAYN:  And Agent Mahan is reminding me that he

76

1    also was present during the meeting -- we had a telephonic

2    meeting with Donna Cole in anticipation of her testimony and he

3    authored a 302 in connection with that conversation which has

4    been previously produced.  But as the Court will note, Ms. Cole

5    is no longer on our witness list.

6                Essentially, Your Honor, he just did the nuts and

7    bolts of shepherding the case around after the investigation

8    was essentially concluded.

9                THE COURT:  Okay.  Thank you.

10               MR. MANINGO:  Thank you, Your Honor.

11               In speaking to Mr. Wright, he subpoenaed Special

12   Agent McPeak.  He is a witness that he anticipated --

13   anticipated being here.  Mr. Wright's position is that if the

14   Government knew that he wasn't going to be here, that this

15   issue could have been brought up sooner than this morning.

16               I appreciate that the Government's providing us what

17   Special Agent McPeak did.  It's quite a bit.  It's not

18   just . . . touching the case here and there it sounds like and

19   more to the point, Mr. Wright believes that the special agent

20   was involved with dealings with Mr. Cole, perhaps his proffer,

21   perhaps his statement, and maybe even in preparing some of his

22   testimony.

23               In a nutshell, Your Honor, Mr. Wright believes that

24   he's necessary to be here.  He was under subpoena.  He should

25   have been here to testify or to respond to the subpoena, or at

2:14-cr-357-APG-VCF - April 28, 2016

77

1    least Mr. Wright should have been put on notice of his

2    unavailability before today.

3              (Brief pause in proceedings.)

4              THE COURT:  Ms. Frayn, when did the Government find

5    out he was no longer available?

6              MS. FRAYN:  Your Honor, I knew that he was out of the

7    district when Agent Mahan came into the case.  I was under the

8    understanding though that Agent McPeak would be back towards

9    the end of this week.  And so . . . that prompted me last night

10   to send an e-mail reminding Agent McPeak that he was under

11   defendant's subpoena and asking rather -- I simply was trying

12   to have a scheduling idea of whether he would be back in town

13   Friday or Monday morning, because I believed that he was on

14   personal leave and would be back at the end of the week was my

15   understanding.  And so, I was going to come prepared to advise

16   the Court, well, he will be back Friday afternoon or no, he

17   won't be back until Monday morning and what I got back in

18   response is, "I won't -- I won't be back until the 9th.  I am

19   not on personal leave.  I am working on the Attorney General's

20   security detail and it is not something I can leave with no

21   notice."  And he also, paraphrasing, advises me that the

22   subpoena did not comport with the *Touhy* requirements and if,

23   after inquiry, the defendant wanted to try and enforce the

24   subpoena, he asked, on his behalf, if the Government file a

25   Motion to Quash the subpoena for failure to follow the *Touhy*

78

1    requirements, which is why I was asking if the Court would

2    inquire with the defendant and we could determine whether he

3    needs to go forward with that because I need to ask leave, if

4    he does, to file a motion to advise the Court that the subpoena

5    may not comply with the *Touhy* requirements and it needs to be

6    quashed.

7              THE COURT:  Okay.

8              MR. POMERANTZ:  Your Honor, if I may.

9              THE COURT:  Sure.

10             MR. POMERANTZ:  I've conferred with Special Agent

11   Mahan and Special Agent Mahan's recollection is that Special

12   Agent McPeak informed the prosecutors for the Government when

13   the case was continued the first time several weeks ago that he

14   was going to be unavailable this week of trial.

15             The continuance for the move.

16             THE COURT:  Oh, yeah.  Yeah.  Yeah.  Three weeks ago.

17   Understood.  Yeah.

18             MR. POMERANTZ:  Yes, sir.

19             THE COURT:  All right.  I do need to hear from

20   Mr. Wright.  But before we do that, we're going to take a short

21   break and I probably need to hear from him outside the presence

22   of the Government.  So, why don't we take a short five minute

23   break right now and we'll resume with just the defendant and

24   Mr. Maningo and call the Government back in when I finish that

25   with him.

1          Okay?

2          Let's take a break.

3          MR. DAMM:  Thank you, Your Honor.

4          THE COURT:  Yep.

5          (Recess was taken at 11:04 a.m.)

6          (Proceedings resumed at 11:27 a.m.)

7          COURTROOM ADMINISTRATOR:  All rise.

8          THE COURT:  Thank you.  Please be seated.

9          MR. POMERANTZ:  Your Honor, if I could make a

10   representation to the Court.

11          During the break Special Agent Mahan and I had an

12   opportunity to speak to the defendant and Mr. Maningo.  The

13   parties believe they have a resolution to this case.  We would

14   ask the Court to not grant or withhold taking any action on our

15   Motion to Dismiss Count Five.  We contemplate a resolution

16   which the defendant would admit that the gun -- he knowingly

17   possessed the firearm on the date in question.  So it would be

18   a plea to Count Five.  And we'd like just an hour or so to put

19   together a written Plea Agreement for Your Honor's

20   consideration.  But the parties have agreed to terms and I can

21   share those terms with Your Honor if you want or if you'd just

22   wait, that's fine, too.

23          THE COURT:  My inclination is to at least get those

24   terms out now so that way if we have a problem at 1 o'clock --

25   I don't want to come back, or whenever we come back and say,

80

1    wait, that's not the deal I thought I had and we've all lost

2    several hours so -- and each accusing the other of

3    misrepresenting.  So at least give me the general terms if you

4    would.

5              MR. POMERANTZ:  Yes, Your Honor.

6              The agreement between the parties --

7              THE COURT:  And let me ask, is there any need to seal

8    this portion of the record?  I wouldn't think so but I don't

9    know that there's any cooperation you're provision you're

10   talking about or --

11             MR. POMERANTZ:  I don't -- no.  No.

12             THE COURT:  Okay.  Okay.  Good.  Fair enough.

13             MR. POMERANTZ:  The agreement between the parties --

14   and Mr. Maningo and Mr. Wright can correct me if I'm wrong --

15   is that he would -- the defendant would plead to time served,

16   which is approximately two, two and a half years, there would

17   be no supervision to follow, and we anticipate the defendant

18   making a motion to be released pending sentencing and the

19   Government's agreed to stand silent when that request is made.

20             MR. MANINGO:  All of that's accurate, Your Honor.

21             THE COURT:  Any -- any fine?

22             MR. POMERANTZ:  Not contemplated.  Not discussed,

23   Your Honor.

24             THE COURT:  So the -- he would plead to Count Five,

25   Felon in Possession of a Firearm.  Government and parties would

1    jointly recommend time served with no supervised release.  No

2    probation.  No fine.  And the defendant would move to release

3    pending sentencing when the Government would be silent on that.

4              Mr. Wright, is that your understanding of the terms

5    that the parties have agreed to?

6              PRO SE WRIGHT:  Yes, it is, Your Honor.

7              THE COURT:  And are there any additional terms you

8    believe the Government has agreed to that you want to tell me

9    right now?

10             PRO SE WRIGHT:  No, there's no additional terms,

11   Your Honor.

12             THE COURT:  Okay.  I will tell the parties, my

13   inclination would be not to release immediately until I can

14   have a report from Pretrial Services.  Typically what I do is

15   on a -- on a detention order, or a detention request, I would

16   at least want something from Pretrial telling me we think it's

17   okay or if they think, no, he's a complete danger, we . . .

18   have real strong reservations -- I just want a little

19   information.  My inclination is to accept the parties' Plea

20   Agreement and to -- and to grant that, but I just want to check

21   myself to make sure there's nothing out there that suggests

22   that Mr. Wright's going to go out and instantly set off a

23   nuclear bomb or burn down the courthouse or something.  I don't

24   think it's going to, I'm being a little facetious but, I always

25   have that precaution because I don't know everything and I

82

1   would want -- and usually they can do that in an hour or two.

2   We would alert Pretrial Services right now and while I presume

3   you will be in the building, they can presumably run up and

4   meet with you.  They could put together some report while -- is

5   there going to be a written Plea Agreement?

6                MR. POMERANTZ:  Yes, Your Honor.  I would request --

7   I guess that was implicit but I didn't request.  The agreement

8   between the parties that the defendant enter his plea, pending

9   the Court's availability, early this afternoon, today.

10               THE COURT:  Yeah.

11               MR. POMERANTZ:  And so I would just seek about an

12  hour to go draft a written Plea Agreement, to have them sign

13  it, and then come in with, of course --

14               THE COURT:  Sure.

15               MR. POMERANTZ:  -- understanding the Court's

16  schedule, as early this afternoon as possible.

17               THE COURT:  Yeah, we need to do this today because

18  I've got the jury waiting.  I'm not going to excuse the jury

19  unless and until I have on the record a Change of Plea Hearing

20  where the defendant has admitted and pled guilty to whatever

21  charge it is and then I would call the jurors and say you don't

22  need to come in tomorrow.  But I'd want that sealed up and

23  buttoned up today.

24               MR. POMERANTZ:  Thank you, Your Honor.

25               MR. MANINGO:  The only thing I would add, Your Honor,

1    is it was -- I recall part of the discussion being whether

2    Mr. Wright is released or not and of course we hope that he is

3    released pending sentencing.  We were going to ask the Court,

4    jointly, and I don't know what the Court's powers are, but, for

5    an expedited sentencing date.  I think that we discussed that.

6            MR. POMERANTZ:  I beg your pardon.  That's absolutely

7    right.

8            THE COURT:  Okay.  And I've done that in the past.

9    I -- I check with Probation to make sure that they've got

10   someone they can put on it right away and do it as quick as

11   possible but it may be -- it may take 30 days, rather than the

12   typical 90.  It may take 45.  It just depends how buried they

13   are --

14           MR. MANINGO:  Of course.

15           THE COURT:  -- over there but, we would make the

16   request and see if they can expedite it.  What I would

17   typically do is set it right now for 90 days but, ask Probation

18   to expedite and if it's done sooner, we can move the hearing

19   sooner.

20           MR. POMERANTZ:  Understood, Your Honor, and there's

21   no objection.  We just -- I should put on the record there's no

22   objection on the part of the United States to expedite that.

23           THE COURT:  Okay.  Thank you for that.

24           MR. MANINGO:  And the last thing, Your Honor, and

25   then we'll let Mr. Wright get interviewed, is I have a

1    3 o'clock appointment that will be hard for me to miss.

2             THE COURT:  Understood.

3             MR. MANINGO:  So I'm hoping we can get it done before

4    that.

5             THE COURT:  You are standby counsel so you don't

6    necessarily have to be here, especially if Mr. Wright doesn't

7    want you here, but, I'm happy to get it done ASAP.

8             It's probably helpful, it's up to you, whether or not

9    you want to be present when Pretrial Services interviews him.

10   I hope Ms. Johansen can send an e-mail or a text or something

11   to Pretrial.  If not, we'll contact Pretrial right away to say

12   Mr. Wright's in the building, let's get somebody together with

13   him right away over the lunch hour while Mr. Pomerantz and Damm

14   and Ms. Frayn are putting together whatever paper, see if we

15   can get it all wrapped up and I'll -- I'm here all afternoon.

16   We'll get together as soon as we all reasonably can.

17            Should we say 1 o'clock just to have a placeholder?

18   Do you want to say 1:30 to be safer?

19            MR. POMERANTZ:  Your Honor, if we could say 1:30 as a

20   placeholder, I think that would give -- certainly give us

21   sufficient time to do it and that would give about two hours to

22   Pretrial, understanding their workload, for them to do what

23   they need to do.

24            THE COURT:  Yeah.  Let's say 1:30 as a placeholder.

25   If it can't all be done right away, contact my office, get in

1   touch with each other, and we'll move it as we need to.

2             MR. MANINGO:  Very good.

3             THE COURT:  But the key is to get it done.

4             If we start by 2:15, we should be done by 3 o'clock.

5   We'll make every effort to make that happen.

6             MR. POMERANTZ:  Thank you -- thank you, Your Honor.

7             And Mr. Wright, so I'm going to make sure you're

8   clear.  You're in agreement with what the Government has put on

9   the record?

10            PRO SE WRIGHT:  Yes, I am, Your Honor.

11            THE COURT:  Okay.  Anybody else need to put anything

12  else on the record right now?

13            MR. POMERANTZ:  No, sir.

14            MR. MANINGO:  No, sir.

15            THE COURT:  All right.  So then we're in recess until

16  1:30.  I'll expect to see a Plea Agreement and we will get

17  ahold of Pretrial and direct them to -- do the deputies know

18  where he will be held so Pretrial can get down and meet him

19  somewhere?

20            U.S. MARSHAL:  Yeah.  They'll have access to him.

21            THE COURT:  Awesome.  Thank you so much.

22            MR. POMERANTZ:  Your Honor, as soon as the Plea

23  Agreement's prepared, I will, with the Court's permission,

24  e-mail a copy to Mr. Maningo and to chambers.  Is that --

25            THE COURT:  Please.  That would be helpful.  Very

86

1    helpful.  And he's -- and the plea is to Count No. Five --

2              MR. POMERANTZ:  Yes, sir.

3              THE COURT:  -- Felon in Possession.  So we'll use --

4    go off of that.

5              MR. POMERANTZ:  So we'll ask you to withhold ruling

6    on our previous Motion to Dismiss it.

7              THE COURT:  Are you withdrawing that motion?

8              MR. POMERANTZ:  We are withdrawing it.

9              THE COURT:  It will be deemed withdrawn.

10             MR. POMERANTZ:  Thank you, Your Honor.

11             THE COURT:  All right.  We'll see you all shortly.

12   Thank you.

13             (Proceedings adjourned at 11:35 a.m.)

14                         --oOo--

15             COURT REPORTER'S CERTIFICATE

16

17             I, Heather K. Newman, Official Court Reporter, United

18   States District Court, District of Nevada, Las Vegas, Nevada,

19   do hereby certify that pursuant to Section 753, Title 28,

20   United States Code, the foregoing is a true, complete, and

21   correct transcript of the proceedings had in connection with

22   the above-entitled matter.

23

24   DATED:  5-6-2016          /s/ Heather K. Newman
                               Heather K. Newman, CCR #774
25                             OFFICIAL FEDERAL REPORTER